**WICK et v YOUNGSTOWN SHEET &
TUBE CO et**

Ohio Appeals, 7th Dist, Mahoning Co

Nos 1776 & 1777.  Decided August 1932

Harrington, DeFord, Huxley & Smith, Youngstown, Day & Day, Cleveland, Squire, Sanders & Dempsey, Cleveland, and Park Chamberlain for plaintiffs.

Kennedy, Manchester, Ford, Bennett & Powers, Youngstown, Cravath, DeGersdorff, Swain & Wood, Baker, Hostetler & Sidlo, Cleveland, for defendants.

POLLOCK, J.

As we have stated, there is no contention but what the issues stated in the pleadings in this case had by the action of Bethlehem become moot. Plaintiffs are urging the dismissal of the appeal in this action on the authority of **Miner v Witt, 82 Oh St 237.** The syllabus of that case reads as follows:

"It is not the duty of the court to answer moot questions, and when, pending proceedings in error in this court, an event occurs without the fault of either party, which renders it impossible for the court to grant any relief, it will dismiss the petition in error."

It is urged on the other hand, by the defendants, that the cause should be dismissed as this case is on appeal in this court, and that as no judgment can now be entered against the plaintiffs, the judgment below should not be permitted to stand. The question to be determined, under these two motions, is, what should be done, under the admitted condition, with this case. When the issues in an action become moot, the court does not refuse to hear the issues in the case because it has lost its right or jurisdiction to do so, but because, as stated in Mills v Green, 159 U.S., 651, which is cited in the opinion in Miner v Witt, supra, courts "decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions." Further, in the opinion in the case just referred to, it is said:

"When without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal."

The effect of the issues in a case becoming moot is referred to in 2 C. J., 575, §2383: (?)

"As appellate courts do not sit to give opinions on moot questions or abstract propositions, the appeal or writ of error will be dismissed where no actual controversy exists between the parties at the time of the hearing, unless the question involved is a matter of public interest, or the judgment, if unreversed, will preclude the party against whom it stands is as to a fact vital to his rights, or the parties by stipulation

have preserved the right to proceed to a final determination, or where the alleged moot question involves the merits, or where the controversy has not ceased to exist, but its status has merely been changed by appellee, or where merely a part of the controversy has ceased to exist, other questions remaining for decision."

Ruling Case Law, in Volume 2, page 170, §145, in a discussion of what should be done when the issues of a case become moot, says:

"Whenever the judgment, if left unreversed, will preclude the party against whom it is rendered, as to a fact vital to his rights, though the judgment if affirmed may not be directly enforceable by reason of lapse of time or change of circumstances, it cannot be said that merely a moot question is involved."

Many other authorities have been cited by the parties in this case, each side claiming that they support that party's contention, but we think we have referred to enough authorities to determine the principle governing the courts under such circumstances; that is, that the court will not permit the judgment to prejudice either party in the cause. The dismissal of these causes would deprive the plaintiffs of the right to present to this court their ancillary issue of the right to recover attorney fees and other costs. If the motion of the plaintiffs to dismiss the appeal was granted, it would leave the judgment in the court below unreversed, and the issue of the plaintiffs' right to maintain the actions and obtain the relief prayed for would be **res adjudicata.** This court hears issues in cases brought in the court on appeal **de novo,** as is stated in the opinion in **Mason v Alexander, 44 Oh St, 318, at page 328:**

"In Ohio the appeal itself vacates, without revisal, the whole proceeding as to findings of fact as well as law, and the case is heard upon the same or other pleadings, and upon such competent testimony as may be offered in that court. It takes up the subject of the action **de novo,** in respect to pleadings, necessary parties, trial and judgment, in like manner as if the cause had never been tried below."

The same rule was announced in **Barnes v Christy, 102 Oh St, 160.** It will be seen if the appeal was dismissed, the defendants, on the issue to recover attorney fees and costs, would be deprived of a material defense in this case. We think that the disposition of the motions of both parties

should be held in abeyance until the determination by this court of the plaintiffs' claim for allowance of attorney fees and other expenses.

We then come to a consideration of one of the issues raised in the pleadings in this case; that is, that the inspectors received and counted illegal votes, which if they had not been counted would have reduced the number of votes cast in favor of the merger to less than two-thirds of the number of shares of common stock. It should be stated that among other conditions in this contract, the consideration which Bethlehem was to pay for Youngstown's property was sufficient cash to pay the preferred stockholders and shares of common stock in Bethlehem for the common shares of the capital stock of Youngstown, at the rate of one and one-third shares of Bethlehem for one share of Youngstown. The first claim of illegal votes cast is that the inspectors permitted, over the objection of the then owners of these shares 61410, which had been sold by the prior owners after the record date and before the 8th of April, 1930. The facts in regard to this claim are not in dispute. All of these shares on the 22nd of March, 1930, the record date, were owned by share-holders whose names appear of record on the corporate books of Youngstown. The owners of all of these shares on the 22nd of March, 1930, had given proxies to vote in favor of the merger to the proxy committee provided by those who were in favor of the merger. After giving these proxies, and after the 22nd of March, but prior to the 8th of April, these shares were sold to Otis & Company. Otis & Company protested the receiving and counting of the votes on these shares on the proxies thus given. The plaintiffs claim first that the provisions of the Code fixing the record date, are in conflict with the common laws and public policy, and such construction should not be adopted in the absence of clear expressions in the Code.

Sec 8623-2 GC provides:
"The term 'shareholder' means holder of record of shares or share holder of record."

Sec 8623-47 GC, which is what is known as the record section, provides, as far as we need refer to it:

"The board of directors may fix a time not exceeding forty-five days preceding the date of any meeting of shareholders, * * * as a record date for the determination of the shareholders entitled to notice and to vote at any such meeting * * * and, in such case, only shareholders of record on the date so

fixed shall be entitled to notice of and to vote at such meeting, * * * notwithstanding any transfer of any shares on the books of the corporation after any record date fixed as aforesaid."

It will be noticed that this date is fixed for the determination of the shareholders entitled to notice of and to vote at any such meeting, and further only such shareholders shall be entitled to notice of and vote in such meeting. We think the meaning of the language used in this section, given its usual and ordinary meaning, is so plain that it does not need a construction. The Supreme Court of this state, especially in recent years, has been disapproving the strained construction of statutes and holding that their usual and ordinary meaning of the words used should be held to be the intention of the legislature in enacting the section. Our attention is also called to §8623-48 GC, which provides:

"At any meeting of shareholders a list of shareholders entitled to vote, * * * showing the number and classes of shares held by each on * * * the record date fixed as hereinbefore provided * * * shall be produced on the request of any shareholder, and such list shall be prima facie evidence of the ownership of shares and of the right of shareholders to vote."

The question has arisen whether the record date is any more than prima facie evidence of the right to vote, but there is no question raised but what on the 22nd of March, the record date, the then owners of these shares and who had executed the proxies, were then the rightful owners of these shares. We think this section does not in any way question the right of the owners of these shares prior to March 22nd to give valid proxies for voting on the 8th of April.

It is further urged that a construction of this section would permit persons to vote at an election when at that time they were not stockholders or interested in the corporation. Such a construction would be in violation of constitutional rights, Article 13, §12. We think not. The section gives the legislature power to enact laws regulating and governing the conduct and actions of corporations organized under the laws of this state. Under §8623-48 GC record holders of stock on the record date were possessed of two rights in the corporation, one the owner of stock and the other the right to vote. He could sell one and retain the other, or sell both. If the purchaser of this stock wished to control the right to vote on the 8th of April, all he had to do was to

includc in his purchase that right and secure a proxy withdrawing the one already given and granting the purchaser the right to use the proxy. This principle was recognized in Thompson v Blaisdell, 107 Atl., 405:

"Whether the vendee shall be disfranchised is thus made to depend on his own action or inaction. There is nothing in the language to prevent the vendee, by agreement with the vendor, from securing his right to vote by means of a proxy, although not yet registered as a stockholder."

We think there was no error in the inspectors of election permitting the proxy holders to vote these shares and afterwards counting them in favor of the merger.

It is further urged first that there were a number of shares voted by the stockholders themselves and those holding proxies, which did not note any number of shares that were voted on their ballot—there was a place provided for such notation on the ballot—and further that in the proxy committee voting their proxies in the blank space on the ballot for noting the number of shares was noted, "All shareholders per list and proxies submitted." We may not understand just how the proxies were identified, but it is evident from what is said that those voting proxies presented the proxies and they were identified, and then they presented a ticket with the notation we have referred to, without giving the number of shares. The counting of these ballots is alleged as error. It is claimed that the ballot itself must be so complete that it needs no assistance in determining the votes cast.

§8623-50 GC provides:
"* * * every shareholder of record at the date fixed for the determination of the persons entitled to vote at a meeting of the shareholders, or, if no date has been fixed, then at the date of the meeting, shall be entitled at such meeting to one vote for each share then standing in his name on the books of the corporation."

In other words, these ballots were cast in view of this section, and the section determines the number of shares that the stockholder was entitled to vote. It was the duty of the committee to look to the record to see the number of votes a voter had a right to cast in counting the ballots in reference to the Code provisions. We think there was no error in counting these ballots. The intention of the voter in casting the ballot is plain when you look at the ballot in reference to the statute. The intention of the voter, at least in the political elections of this state, has' been the polar star

in determining the right to vote and how he voted, and this rule has also been recognized in State ex Firtz v Gray, 20 Ohio, 26, in corporation elections.

There are some other minor objections noted, but we think we need spend no further time on the question of the illegal ballots cast and counted. We think that the inspectors of the election were correct in receiving the ballots and counting them as they did, and that more than two-thirds of the common stock of Youngstown were voted on the 8th of April, 1930 in favor of the merger.

We come now to a consideration of the grounds urged that the further carrying into effect of the proposed contract should be enjoined because of the action of the officials and Board of Directors, which resulted in the resolution of March 12, 1930, agreeing to sell this property, and also the grounds urged in regard to the stockholders' meeting of April 8th. Before referring to the facts, we think it well to consider the legal rights and liabilities of the plaintiffs and defendants in this action, which, as we think, control the parties in the questions to be now considered.

As we have already said, §8623-65 GC, provides the necessary steps which must be taken in order to sell the property and assets of corporations. First, the Board of Directors at a meeting must pass a resolution agreeing to make the sale, but this resolution to sell has only binding effect when and as authorized by vote of holders of shares entitling them to exercise at least two-thirds of the voting power on such proposal. When two-thirds of the shares are so voted the sale is authorized and the directors can then proceed to enter into the necessary transfer of the property of the corporation. §8623-72 GC provides for the rights of a dissenting shareholder who does not care to accept the consideration received under such a sale. He has a right under this section, after giving proper notice, to the fair market value of his shares the day before the vote is taken, excluding any appreciation or depreciation in consequence of the consolidation. Then follows the necessary step for determining the cash value. The section further provides that a shareholder who does not object and takes advantage of the proceedings for securing the fair market value of his property, shall be concluded by the vote of assenting shareholders.

The Court of Appeals of Maryland, under somewhat similar statutes of that state, had the question before it in Homer v Crown Cork & Seal Company, 141 Atl., 425, and in the opinion, on page 434, the court says:

"Unless acting ultra vires, illegally or in bad faith, the directors of a corporation of the prescribed class, have a statutory right to approve of a sale of all its assets as an entirety, at a given price, and the stockholders owning two thirds of all the stock outstanding and entitled to vote may approve of such sale, and it will then be made. This is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action. Supra. France on Corporations (2nd Ed.) p. 59, §38, p. 62. A sale so authorized is, however, subject to the right of the dissenting minority to be paid, notwithstanding the sale price, the fair value of his stock."

And again, on the same page:

"These provisions of the statute assure to the minority stockholder a full, ample and complete remedy to secure the fair value of his stock, with a provision for review and the right of appeal to this tribunal. In our judgment the bill of complaint states a cause where the fundamental inquiry is one of value in an ultra vires corporate transaction, and the statute would seem expressly adapted to afford the appellants all the relief to which they may be entitled."

The District Court of Montana in Wall et v Anaconda Copper Mining Company et, 216 Fed., 242, says on page 246:

"Herein the fraud charged must be proven and by legal evidence, and not merely alleged in pleadings and for proof rested upon argument and oratorical endeavor. Finding no fraud in the sale,, finding the stockholders' consent was free, it is unnecessary to inquire into the purchase price. That was determined by the holders of two-thirds of Parrot stock; Amalgamated holding a little more than half said stock. They satisfied, none can complain. They could direct a corporate sale for any consideration, even as they individually could make personal sales. Doubtless gross inadequacy might be a circumstance in a fraudulent sale. Aside from that, the dissenting stockholder has a plain, speedy and adequate remedy at law in the appraisal proceedings provided by the statutes, wherein he secures the value of his shares though the others receive from the sale but a tithe thereof."

The Circuit Court of the United States in Metcalfe v American School Furniture Company, 122 Fed., 115, in discussing the rights of a stockholder where either the by-laws of the corporation or the statute of the state under which it is organized provided for a sale, on page 119, the court said:

"The trend of the decisions is to the effect that where the charter and by-laws of a corporation, and the statute under which it was created, vest in the stockholders a right of sale of the corporate properties and discontinuance of corporate existence, such power may be exercised by them pursuant to the laws of the state to which the corporation owes life. * * * Theoretically, the law appears to be founded upon the contract between the corporation and its stockholders. A shareholder presumptively knows the power and authority conferred upon directors and majority stockholders. When such majority undertake to exercise their legal powers, a minority stockholder cannot be heard to complain, in the absence of fraud or attempts to exceed their legal authority."

It will be seen by these authorities and others that might be referred to, but we think these are sufficient, that the only grounds upon which the minority stockholders can maintain an action, are that the proceedings are ultra vires, illegal or fraudulent. As there is no claim that the contract now before the court was either ultra vires or illegal, except as hereinafter noted, the only right to maintain this action is on the ground of fraud.

The Supreme Court of this state in the recent case of Geiger v American Seeding Machine Company, 124 Oh St 222, had under consideration the two sections of the Code involved in this proceeding. The sixth proposition of the syllabus reads as follows:

"The procedure outlined by §8623-72 GC, is an exclusive remedy for minority stockholders in reference to a sale, but as that section stood in May, 1929, (112 Ohio Laws, p. 37) had no application to the distribution of the proceeds of such sale among different classes of shareholders."

It was suggested in argument that the question before the Supreme Court in that case did not involve the sale but rather the distribution of sale consideration, but even if that is correct, this is a syllabus, and this court is bound by the law announced by the Supreme Court when at least placed in the syllabus, but Chief Justice Marshall, in the opinion, after referring to §8623-72 GC, says:

"It is therefore a question of the interpretation of that and other statutes, and of applying the law to the admitted facts."

We think the Supreme Court did have the question of the construction of §8623-72 GC before it, and further in the opinion it is said:

"The contract of sale is governed by §§8623-65 and 8623-72 GC, and that contract having been approved by more than three fourths of the stockholders, became a binding obligation upon the corporation, and all of the preferred stockholders who did not consent thereto, except William E. Keifer, as trustee, are concluded thereby. As to the sale, §8623-72 GC is an exclusive remedy for the minority stockholders. As the result of the objection of Keifer, trustee, and his notice given within twenty days, he is entitled to claim the fair cash value of the shares of preferred stock owned by him, to be determined in the manner set forth in the statute. As a result of the failure of the other plaintiffs in this action, who did not make an objection and did not give the notice within twenty days, they are not entitled to receive cash, but are only entitled to their proportionate share of the stock of the Delaware corporation which was paid to the Ohio corporation in return for the conveyance of the assets of the Ohio corporation."

It will thus be seen that the Supreme Court has announced that the remedy provided by §8623-72 GC is the exclusive remedy for the minority stockholders. In that case the question of fraud was not before the Supreme Court, and we do not think that the construction of that section announced by the Supreme Court should limit the right of the minority stockholders where they allege in their petition and prove fraud, especially in the action of the Board of Directors of the corporation. So we will proceed to consider the ground urged upon the court that there was fraud in the action of the Board of Directors in entering into this agreement for the sale of the property of Youngstown.

It is claimed that the officers of Youngstown initiated the sale of all the property, assets and good will of Youngstown without the authority of the board, and that the Board of Directors did not have time after learning of the proposed sale, and did not give the sale the consideration that the importance of the transaction deserved. The negotiations with Bethlehem for the sale of the property of Youngstown were initiated by James A. Campbell, the Chairman of the Board of Directors of Youngstown, probably on the 3rd of January, 1930, by approaching Mr. Grace, the President of Bethlehem, upon the subject of merger. At that meeting Mr. Grace informed Mr. Campbell that if Youngstown had a merger with others under consideration, that he would not be interested while such negotiations were pending. At that time there were negotiations pending between Youngstown and the Inland Steel Company, attempting to form a merger of the two companies. After Mr. Campbell returned to Youngstown these negotiations were broken off, and on January 16th, Mr. Dalton, a member of the Board of Directors of each of these contracting companies, and Mr. Campbell, again met with Mr. Grace and the negotiations were begun. The advantages of the merger to each company were discussed, and other matters of a general nature, and it was concluded to call upon Price-Waterhouse & Company, an accounting firm, which had been for years the auditor of both companies, and were known to them to have been the auditors of a number of other large companies. At that meeting it was agreed that this company, or rather Mr. May, the head of it, be jointly engaged to recommend a basis for the exchange of stock of the two companies. This is about as far as the negotiations went at this time, but on January 23rd, Mr. Purnell, the President of Youngstown, met Mr. Grace, and Mr. May was called into their negotiations. It was agreed at that time that for the purpose of determining a comparable basis for the relative value of the stocks, that Mr. May should determine that question. In the former auditing of these companies by Price-Waterhouse & Company, Mr. Campbell of that firm had been the member of the firm in charge of the auditing of Youngstown, and Mr. Scobie had been in charge of the auditing of Bethlehem. At the suggestion of Mr. May, it was agreed by Mr. Grace and Mr. Purnell, that Mr. Campbell should make the examination of Youngstown and Mr. Scobie of Bethlehem, and that they should present the facts thus learned as to the earnings of both companies to Mr. May, and each one should be the representative of the company which he examined, and in that way the relative value of the common stock of the two companies should be determined as appears from the earnings. Mr. May being the final arbiter. This was done, and on the 13th of February, 1930, Mr. Campbell, Mr. Dalton and Mr. Grace met Mr. May, and at that meeting Mr. May made his report, which was verbal. He never made a written report of the conclusion. The conclusion which he had reached was that a fair basis for an exchange of the stock of the two companies would be one and one-fifth shares of Bethlehem for one share of Youngstown. After some further discussion of the proposed merger, the parties separated, and the next meeting was on the 21st

of February, between Mr. Dalton, Mr. Campbell and Mr. May. This meeting was for the purpose of notifying Mr. May that Mr. Campbell and Mr. Dalton had concluded to suggest to Mr. Grace that the proper basis would be one and one-fourth shares of Bethlehem for one share of Youngstown. They returned home and in the meantime Mr. Samuel Mather and Mr. W. G. Mather were consulted by Mr. Dalton. Mr. Samuel Mather was the largest personal stockholder of Youngstown's common stock. In addition to that, he was interested in other shares which he had donated or given to others and to organizations. Mr. W. G. Mather was the President of the Cliffs Corporation, which corporation was the owner of the greatest number of shares of common stock of Youngstown. After the two Mathers had approved the merger, Mr. Campbell was notified and he and Mr. Dalton returned to New York and met Mr. Grace and Mr. Shick, who was holding some position with Bethlehem. After some discussion of the matter between these parties, Mr. Grace offered to make the exchange at one and three tenths. This was discussed and different reasons given pro and con for the stand that each party was taking, when Mr. Campbell suggested that Mr. Dalton and he retire. They were to again meet Mr. Grace later in the evening and take dinner with him. They retired possibly about six o'clock in the evening and met Mr. Purnell in Mr. Campbell's room. Mr. Purnell had been that afternoon in conversation with Mr. Campbell of Price-Waterhouse & Company. They talked the matter over among them, and Mr. Dalton suggested that they try one and one-fourth. There was some further talk and Mr. Campbell objected and said that he did not think that Mr. Grace would do that. Mr. Dalton then suggested one and thirty-five hundredths. This was discussed, and Mr. Campbell, thinking that Mr. Grace had offered about all that he would give, thought it was not well to go to dickering, and he proposed that it be made one and one-third, and to make the offer in such a way that Mr. Grace would understand that it was practically their ultimatum. This was agreed upon by the three and they returned to Mr. Grace's home, and there the proposition was made by Mr. Campbell as arranged. After some talk Mr. Grace asked to retire, and he and Mr. Shick retired and returned shortly thereafter and said that they would accept that offer. The exchange of one and one-third shares of Bethlehem for one of Youngstown was agreed to between the parties on that night. In the meantime, and some days before this, the directors at least who were accessible to Mr. Campbell and Mr. Purnell, were told

of the proposed merger. The next thing that occurred was that an arrangement was made for Mr. Campbell and others to meet Mr. Eaton, who was the Vice President of Cliffs Corporation, on the 7th of March, 1930, and explain to him what had been done. Mr. Eaton was very much opposed to the merger, and gave his reasons. Mr. Eaton did not oppose a merger, but claimed it would be best to merge with some other company rather than with Bethlehem. The proposed meeting of the Board of Directors was the next day. Before the parties left Mr. Eaton, it was arranged that the meeting of the Board of Directors should be continued until the 12th, and that they should return and have another conversation with Mr. Eaton on the 11th. Mr. Eaton says that he did not know that the auditors of Price-Waterhouse & Company, Mr. May and Mr. Campbell, were to be present on the 11th, while the others thought that the understanding was that they were. Anyway, Mr. Campbell, Mr. Dalton and Mr. Purnell, with the representatives of Price-Waterhouse & Company, met Mr. Eaton. At this time the meeting was held in the office of Samuel Mather. Mr. Mather called the meeting to order and asked Mr. May to explain his reasons for making the recommendations which he did. Before he could get his papers ready, Mr. Eaton took the floor and strongly opposed the merger, along the same lines as at the prior meeting. This was kept up back and forth among the parties and Mr. May was not given a chance to make the explanations. Mr. Eaton claims he told them that he did not want to look into the data and papers, that he wanted them referred to his accountants. He is not sustained in the latter part of this claim. He asked the directors who were present to continue the directors' meeting that was to be held on the next day. This they declined to do. On that evening there was a publication in one of the papers circulating in Cleveland and the neighborhood of Youngstown, stating that there was a prospect of such a merger, and violently opposing it. The next day the meeting of the Board of Directors was held. The Board of Directors of Youngstown consisted of eleven members. Nine members were present. Mr. Severance was in California, and Mr. Booth was sick. The meeting was called to order at probably two o'clock in the afternoon, but there had been an informal meeting and expression of opinion by the directors during the forenoon. When the meeting was called to order Mr. Campbell presided and called the attention of the Board of Directors to the request of Mr. Eaton that they adjourn that meeting over without taking any action, Whether there

was a formal motion made to that effect or not, it appears that there was no member of the board in favor of continuing the meeting. The question of the sale of the property was then mentioned. Mr. Campbell then proceeded to tell of the negotiations that had been going on, and earnestly urged the sale of the property. Mr. Campbell had been connected with Youngstown since its organization, as President or Chairman of the Board of Directors. Mr. Campbell then called upon Mr. Purnell, the President, who was more familiar with the auditors' figures and the work of the auditors through the company's auditor, Mr. McDonald, and also through conversation with Mr. Campbell of Price-Waterhouse & Company. He told the board about what had been done, and the efforts of Mr. McDonald and himself to get a fair basis for determining the value of the property by the earnings of the two companies. Mr. Campbell thought that Bethlehem did not take as great a depreciation as Youngstown did, and this was a matter of concern with him. It was stated that Mr. McDonald, Youngstown's auditor, had been with Mr. Campbell of Price-Waterhouse & Company, and had talked this matter over and become satisfied that the depreciation and maintenance allowed the two companies finally reached by Price-Waterhouse & Company was as fair to Youngstown as they could ask. Upon leaving the meeting with Mr. Eaton on the 11th, Mr. Purnell had asked Mr. Campbell of Price-Waterhouse & Company for some figures to refresh his recollection. Mr. Campbell gave to Mr. Purnell what is now known as exhibit five. That exhibit was referred to by Mr. Purnell, and different items called to the attention of the Board of Directors. At the last meeting between Mr. Campbell and others with Mr. Grace, after it was agreed upon the one and one-third ratio of the stock, it was then arranged that the chief counsel of each company should meet and prepare a contract. This was done. It is urged that there was fraud in holding the meeting on the 12th against the protest of Mr. Eaton. An article appeared in a paper on the evening of March 11th, in opposition to the merger. It was circulated to divide and disturb the stockholders owning the common stock, and also it was calculated to prejudice them against the sale of the property if the Board of Directors should decide that it was for the best interests of Youngstown to make the sale. We think under these conditions that it was to the best interests of the stockholders that the board should determine whether the stockholders should be asked to vote on the sale without any further delay. There is no evidence of fraud in the board refusing to continue the meeting.

It is further claimed that this contract should have been made in its inception by the Board of Directors, and that they should have been instrumental in preparing the contract. The two Boards of Directors could not have met and arranged a sale of the property. The contract could be arrived at by one or two persons, representatives of each company, and it was entirely proper that when the contract was agreed upon that there should be a written contract so that the Board of Directors of each company would know that in either accepting or rejecting the proposition, that they were acting on exactly the same terms and conditions.

It is further urged that Youngstown's Board of Directors did not give the proposition to sell all of the property of Youngstown the consideration that they should have given it. It is true that the board did not go into the auditors' figures, but they would not have understood them, perhaps, if they had, but they were men of long experience and knowledge of the business of manufacturing iron. They had more or less knowledge of the condition of Bethlehem, and in addition to that the question of a merger of Youngstown with some other company had been of long standing, and it seems that not only the Board of Directors, but the larger stockholders, were in favor and thought it necessary that there should be a merger. We think there was no fraud in the Board of Directors proceeding to pass the resolution to make the sale at the time they did and with the consideration they had then given the subject.

The next error urged is that exhibit five, page ten, did not state the true basis, or the true amount, of maintenance of the two companies, that it was very much against Youngstown. It seems to be conceded on all sides that there was a difference in the bookkeeping between the two companies, and that to arrive at a basis it was necessary to consider depreciation and maintenance together. At this meeting no one of these directors except Mr. Purnell had possession of this exhibit. He read from it more or less. We have examined the exhibit and it is evidence that he did not read it all to the Board of Directors. Whether he referred to page ten or not, posisbly the evidence does not say, but this Board of Directors took, and necessarily must take, the conclusion of Mr. May as to the comparable value of the earnings of the two companies. They were considering other matters which convinced them that it was desirable for the merger. We think that the Board of Directors were not deceived by any mistake, if mistake it is, in exhibit five.

We next come to the claim regarding Mr. Dalton, who was one of the directors and one of the active directors in these negotiations, and who, at the suggestion of Mr. Campbell, had been with Mr. Campbell on all of the visits to Mr. Grace except the first one. It was known that he was a director of Bethlehem as well as of Youngstown, and it is also in proof that he belonged to the firm of Pickands-Mather & Company, and that company had important contracts with Bethlehem for the furnishing of ore, seventy-five per cent of which could be cancelled at the discretion of Bethlehem. Pickands-Mather & Company also had contracts with Youngstown. It does not appear any place in the evidence that Mr. Dalton was not entirely fair in all of his dealings between these two companies. From what appears in the evidence, Mr. Dalton urged Mr. Campbell to insist upon a greater percentage in the stock transfer. It does not appear that he attempted to control the judgment of any of the directors. One of the directors did say that he relied upon what Mr. Dalton said, but it was not because Mr. Dalton controlled him, but because of his belief in Mr. Dalton's honesty and ability to judge in such matters.

It is urged that because Mr. Dalton was a common director and had contracts with Bethlehem, that the burden was on the defendants to prove that there was no fraud or no unlawful effort upon the part of Mr. Dalton to dominate the sale. We think this question was disposed of in this state in the case of **United States Rolling Stock Company v The Atlantic & Great Western Railroad Company, 34 Oh St, 450.** The third proposition of the syllabus in this case reads:

"A contract made between two corporations through their respective boards of directors, is not voidable at the election of one of the parties thereto, from the mere circumstance that a minority of its board of directors are also directors of the other company."

And again, in the opinion, on page 466, it is said:

"If the mere fact that a minority of one board are members of the other, gives the company an option to avoid the contract, without respect to its fairness, the same result would follow where such minority consisted of but one person, and notwithstanding the board might consist of twenty or more. In our judgment, where a majority of the board are not adversely interested, and have no adverse employment, the right to avoid the contract or transaction does

not exist without proof of fraud or unfairness."

It is not denied by the plaintiffs that this is the rule announced by the Supreme Court in this state, but the claim is made that the rule has in recent years been modified, if not in this jurisdiction, in other jurisdictions. With that view we have referred to 2nd Thompson on Corporations, page 213, §1241.

"A contract between two corporations is not rendered void by the mere fact that some of the persons assisting in making the contract and taking a part in the performance of conditions and in the acceptance of performance, were directors in both companies, and represented both to the extent of their respective powers. The identity of the officers does not of itself invalidate the dealings between the two corporations. There is no presumption of unfair action raised by the mere fact of dealings between corporations having directors in common."

On page 215 this author says:

"Such contracts will not be voidable, in the absence of fraud, where there was a quorum in both corporations who were not rendered incompetent to act by reason of being directors in both corporations."

The author cites the Ohio case as authority. The Circuit Court of Appeals of the Second District, in Wentz et v Scott, 10 Fed., Second Series, 426, on page 428, says in the opinion:

"There can be no presumption that the agent of two parties will deal unfairly with either."

Citing the Ohio case. We think we are bound by the rule announced in this state, but it occurs to us that the seeming conflict in the decision is not so much a conflict of law as of facts. The seeming conflict arises from the different facts that appear in the case. No better illustration of this can be found, we think, than Geddes v Anaconda Coal Mining Company, 254 U.S., 590. In that case it appears from the facts that one Ryan, from his sale and holding of this property, dominated the Board of Directors, and the court says in that case that the burden of fairness of the contract is upon those who are seeking to affirm the sale. The court cites some four other cases of the Supreme Court of the United States holding to this principle. An examination of these cases shows that the rule announced in them was under similar circumstances,

where fraud or domination appeared in the evidence.

There is a further reason. This action of the Board of Directors was ineffective until it was authorized by the vote of the stockholders. This question was before the Supreme Court of Indiana in Norton v Union Traction Company, 110 NE, 113, and in the opinion on page 120 the court says:

"Appellants place such stress on the fact that three of the directors in one of the constituent companies occupied the same office in the other. A director holds a position of trust toward his company and the stockholders thereof; but, while this consolidation agreement was proposed by the boards of directors, it became effective only by the action of the stockholders themselves. As a consequence, the rules applicable to a consolidation effected by the directors,—agents of the stockholders—do not apply where the action is taken by the principals."

The same question also arose in Homer v Crown Cork & Seal Company, supra, in the opinion on page 432; Colgate v United States Leather Company, 67 Atl., 657. We think there was no fraud shown in this case in the participation of Mr. Dalton in these procedings. This resolution was passed by the vote of six members of the Board of Directors, Mr. Dalton saying he was in favor of the proposition, but declining to vote on account of his being a director in both companies. Mr. Creach did not vote because he was a representative of Mr. Eaton. Mr. Mather did not vote because he was connected with the Cliffs Corporation. The six members who voted in favor of this resolution had no connection that in any way inferred or suggested that they were not exercising their best judgment, and in addition their personal means were largely invested in this company. It does not appear that the vote in favor of selling the property of Youngstown was induced by fraud, but by the honest judgment of such members voting therefor.

In Raff v Darrow, 111 NE, 189, in the opinion on page 190, it is said:

"A consolidation under section 6 of the act cited can be effected only by a majority vote of the stock of the constituent companies. Norton v Union, etc., Co., supra. The initiative action, as shown by the special findings in this case, was taken by the several boards of directors of the companies participating in the consolidation; but this action of the boards of directors was ratified and confirmed by the action of the stockholders of each company at meetings subsequently held. It thus appearing that the holders of the majority of the stock of each corporation favored the action taken, a minority stockholder has no right to question the proceedings on the ground that they were irregular or that the boards of directors assumed to act beyond their power."

We then come to the question of the claimed fraud that induced the owners of more than two-thirds of the common stock of this company to vote in favor of the merger. Personally, I doubt the right of minority stockholders in a sale under these sections to maintain an action for injunction because of fraud practiced on the stockholders in voting for the sale. The stockholders who voted their shares had a right to do so, even if there was fraud in the efforts to obtain an affirmative vote upon the proposition. No one of these stockholders has in any way manifested a disposition to change his vote. We do not intend to base this part of the opinion upon that proposition. The chief ground that is urged, perhaps, by the plaintiffs, is because of the refusal of Bethlehem to permit the accountants of those opposed to the merger to examine the papers now known as exhibit five. The right of the plaintiffs to have access to exhibit five was before the court in Shover v Youngstown Sreet & Tube Company, in the Federal Court. Mr. Shover was a dissenting stockholder and had brought the aciton to compel the continuance of the meeting of the stockholders beyond April 8th. The case was decided on the 7th. The court announced the principle that a party making a sale can not be compelled to permit the buyer to examine the property if he does not wish to. He can fix his price and say "You can either take it or let it alone." This is a proposition which needs no citation for approval. But, it is urged that the circumstances in this case are different from the ordinary sale of property, and we will go forward and discuss the proposition from the facts appearing in the record.

Soon after the meeting of the Board of Directors on April 8th, the opposing stockholders formed a committee to oppose the merger, and the committee also employed Ernst & Ernst, public accountants of Cleveland. In a letter directed to Mr. James A. Campbell, the committee asked for the papers and exhibits regarding the work by Price-Waterhouse & Company in determining the relative value of the stock, that was before the Board of Directors at their meeting of the 12th. Mr. Campbell answered, saying, in substance, that Price-Waterhouse & Company had these papers and that they could obtain them from that company. With that, a representative of Ernst & Ernst,

and an attorney representing the opposing stockholders, went to New York to see the papers. Price-Waterhouse & Company refused to permit them to see the papers, upon the direction of Bethlehem. They came back home and there was some other correspondence, when Mr. Grace, for Bethlehem, wrote to Mr. Campbell regarding its refusal. Mr. Grace wrote that if Ernst & Ernst had no connection with certain companies, which he named, that Bethlehem would direct Price-Waterhouse & Company to show them any papers or give them any information in regard to Bethlehem that was involved in the determination of the earnings of the company; that if Ernst & Ernst could not comply with these terms, if the committee would secure the services of any one of six companies, which Mr. Grace named in his letter, Price-Waterhouse & Company would give like information to any one of the six companies that the committee might select, but if the committee did not see fit to do this, that Ernst & Ernst could address any questions to Price-Waterhouse & Company that Ernst & Ernst deemed important on this subject, and that Price-Waterhouse & Company would answer them. The opposing committee seems to have adopted this last suggestion and Ernst & Ernst addressed to Price-Waterhouse & Company probably twenty questions, which were answered by Price-Waterhouse & Company. There was no objection to any of the questions not being answered fully except one which we will refer to later. We think that the restrictions by Bethlehem upon Ernst & Ernst's right to examine the account of that company were reasonable, and that the opportunity that Bethlehem gave the committee to get the information desired was all that should have been expected by the committee, and that fraud can not be predicated upon the refusal of Bethlehem to comply with the committee's request.

It further appears that at the time Mr. Campbell answered this letter and said that what is now known as exhibit five was returned to Price-Waterhouse & Company, it had not been returned. It was handed to Mr. Purnell by Mr. Campbell of Price-Waterhouse & Company, as stated, to enable him to refresh his recollection on some of the figures and to be returned by handing it to a representative of Price-Waterhouse & Company, who was then in Youngstown. This was done by Mr. Purnell and he thought, and Mr. Campbell thought, that it had been returned, but it was yet in the Youngstown office at the time Mr. Campbell wrote the letter. Afterwards, when Mr. May discovered that it had not been returned, he sent it back to Price-Waterhouse

& Company. When questioned about his reason, he said he did it to prevent the papers becoming involved in the courts of this state. Under what we have said, we do not think that there was any fraud upon the stockholders of Youngstown by the action of Mr. May.

It is claimed that on page ten of exhibit five there is an error against Youngstown in the amount of maintenance given Youngstown. These papers that were given by Mr. Campbell of Price-Waterhouse & Company to Mr. Purnell were known as "work sheets," which Price-Waterhouse & Company had used in arriving at its conclusion as to the relative value of the common stock of the two companies, but were not the final basis of the calculations. Each of the directors who voted in favor of the merger, and whose deposition was taken, said he knew they were work sheets. The depreciation and maintenance of both companies that appear on page ten were the depreciation and maintenance stated by each of these companies in their annual report of what is known as the six companies. This report was open and accessible to Ernst & Ernst at any time and they knew of and had the report. The members of Price-Waterhouse & Company testified that exhibit five was among the first work sheets that they had in commencing this investigation, and that there was no error in the exhibit for the purpose for which it was intended. It does not contain the final estimate of these two companies upon which this calculation was made. There is a disagreement between the finding of Price-Waterhouse & Company and Ernst & Ernst. The two accountants do not agree, do not reach the same conclusion, but the question of which was right and which was wrong was a question for the stockholders to determine for themselves. At the time and prior to the time that the vote was taken, the stockholders had information that Ernst & Ernst claimed that PriceWaterhouse & Company had made errors in their calculations against Youngstown. In fact, in a speech, and perhaps a circular sent out, by Mr. Eaton, he called them grievous errors. We think there was no fraud or deception practiced upon the stockholders. It would have been impossible for the stockholders to determine which of these agreements was right, and they had the information that they disagreed and greviously disagreed. Probably the stockholders were warranted in following Price-Waterhouse & Company rather than Ernst & Ernst. Price-Waterhouse & Company were employed by the two companies to make an impartial determination of the relative earnings of these two companies, while Ernst & Ernst were em-

ployed by parties who were seeking to find fault and error in the proposed sale of this property.

The next error complained of is that Youngstown and Bethlehem secured three public accountants to make an examination of the proceedings of Price-Waterhouse & Company, and determine whether they were correct or not, that the report sent out deceived the stockholders, that it purported to be a complete audit of these two companies, and finding that the result reached by Price-Waterhouse & Company was not unfavorable to Youngstown. We do not think that this is a fair criticism of this report. The second paragraph of the report sets out what these companies considered in arriving at the conclusion that they did. The report of the three accountants did not claim that they had made an independent audit of the books of Youngstown and Bethlehem. These accountants were employed after Mr. Eaton had made charges that the audit of Ernst & Ernst showed serious mistakes in the work of Price-Waterhouse & Company. While this campaign was going on, stockholders in favor of the merger, including members of the Board of Directors, appointed a committee to further their views in the coming election, just as those opposed to it had done. Members of the board and other stockholders also wrote circular letters to the stockholders, in which it is claimed that they exaggerated the care and research made by the Board of Directors before they voted as they did in favor of this merger. In discussing the questions regarding the activities of members of the Board of Directors, after they had voted favorably to this merger, we must remember that the members of the board were in dual positions. First, the Board of Directors was required to treat the stockholders, and each of them, fairly in their actions as members of the Board of Directors, and furnish them such information as they had. There is no complaint but what the directors of Youngstown did this as members of the Board of Directors. As stockholders they had the same right as any other stockholder to urge upon other stockholders their claims that this merger was beneficial to Youngstown. We do not think we need go further in referring to these claims of fraud than to say that we are unable to find that the members of the board or others who were in favor of the merger, overstepped their rights as stockholders.

The next error complained of is the failure to notify the stockholders of the large bonuses which Bethlehem was paying to its executive officers. In 1929 Bethlehem paid to its executive officers $3,425,000 in bonuses, Mr. Grace receiving $1,833,753. It is claimed that there was fraud upon the part of Price-Waterhouse & Company in not divulging this fact in answer to one of the questions which Ernst & Ernst addressed to them. Price-Waterhouse & Company were not engaged to determine whether either of the companies was extravagant, or paid too much for service or any other purchases by the company. They were employed to determine the comparable ratio of the earnings of the two companies. This large amount was paid as expenses of Bethlehem, and of course did not increase the earnings of that company, but decreased them. It is also complained that the directors of Youngstown did not inquire about the bonuses and make them known to the stockholders. It appears that Mr. Campbell and Mr. Dalton had some knowledge that bonuses were being paid, but they did not know the amount. The custom of corporations compensating their executive officers in part, at least, by bonuses is not uncommon, and the knowledge of it would not arouse the suspicion of anyone having knowledge of that means of compensating officers of a corporation. It is only the amount. None of the persons named knew of the amount, and it appears that Mr. Eaton had just as much knowledge of the bonuses as any one of the Board of Directors. If he wanted to know, he should have directed a letter to Bethlehem in that regard, which it could either have answered or not, as it deemed best. It was not a matter that Bethlehem was required to divulge if it did not desire to do so. The amount of these bonuses would be a matter of consideration for one who was intending to buy stock in the company, and if the stockholders had been notified of the amount of the bonuses, possibly that would have had some influence upon their votes, but we do not think that Bethlehem was required to make such a disclosure and there was no fraud in Youngstown's Board of Directors not discovering the excessive amount of the bonuses and making it known to the stockholders, especially when the parties opposing the merger had knowledge of the fact that bonuses were being paid and did not see fit to ask the board to inquire regarding the amount.

The next contention is that the contract was illegal because of the provision relieving from payment of taxes on the Bethlehem stock owned by residents of this state. Youngstown is an Ohio corporation and the stock was exempted from taxation in this state. Bethlehem was not an Ohio corporation but a Delaware corporation, and stock owned by residents of this state would be taxable. Without reciting the provisions of the contract, it is sufficient to say that it provided that for three years after entering

into this agreement. Bethlehem would relieve stockholders resident of this state of this tax, either by complying with the law of this state so that the stock would not be taxable, or by paying the tax.

It is claimed that this is not an equal distribution of the stock; that it is giving to the stockholders residing in this state more than their share of the distribution. The distribution of the common stock which Youngstown was to receive for this merger was not provided in the contract, but under the statute of this state it would have to be distributed equally in accordance with the number of shares of each stockholder. In other words, it would be required to be distributed one and one-fifth shares for each share owned by a stockholder in Youngstown. The stock of Bethlehem was not taxed in Delaware, or any other state, so far as appears from the evidence, so that the stock of Bethlehem secured by residents of this state in the merger would be taxable. In other words, a person living in this state who held stock in Youngstown, when transfer was made and he received his stock in Bethlehem, his stock would be less valuable than the same stock held by residents of other states to the amount of taxes paid thereon, so that it was not giving Youngstown's stockholders who secured stock in this merger and residing in this state an advantage, but only making them equal. We do not think that this provision rendered the contract illegal.

There are other complaints made through the record and in the briefs and argument, but we think there are none which tend to prove that there was any fraud practiced by the directors or any one else favorable to the merger in this case which tended fraudulently to influence the stockholders to vote in favor of the merger. Finding as we do, the plaintiffs had no right to maintain an action enjoining the completion of this sale. If they had no right to enjoin the completion of the sale of Youngstown's property to Bethlehem, Youngstown can not be required to compensate the plaintiffs for their attorney fees or other expenses in connection therewith.

The exceptions of the plaintiffs to the finding of the Referee's report are overruled and the Referee's findings affirmed and judgment entered in favor of the defendants on the issue as to the claim for attorney fees and other expenses. Reaching the conclusion that we have, the motion of defendants to dismiss the case is sustained.

The Referee has asked that he be allowed the sum of $6,000.00, and so far as we know there is no objection raised thereto. That sum is allowed the Referee, and his expenses of $86.90, to be paid by plaintiffs as costs in this case. If motion for new trial is filed it is overruled and exceptions noted.

ROBERTS and FARR, JJ, concur.