Emily Pridmore, Appellee, v. Whiting Corporation,
Appellant.

Gen. No. 36,055.

Heard in the second division of this court for the first district at the June term, 1932. Opinion filed December 30, 1932. Rehearing denied January 11, 1933.

BUTLER, POPE, BALLARD & ELTING, for appellant; BEVERLY B. VEDDER and MINIER SARGENT, of counsel.

CHARLES J. TRAINOR, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In a proceeding commenced by virtue of the provisions of amended section 73 of the General Corpora-

tion Act of Illinois, in force July 1, 1919, Cahill's St. ch. 32, ¶ 73, there was a hearing before the court without a jury in April, 1932, resulting in a finding and judgment against defendant for $13,336.27, and the present appeal followed.

Under the pleadings the ultimate question for the court's determination was the "fair value" of plaintiff's 765 shares of stock of the Grindle Fuel Equipment Co. (hereinafter called the Grindle Co.). In making the finding the court fixed that fair value at $13,011 (approximately $17 a share) and added interest thereto from November 12, 1931, of $325.27. It is provided in the amended section of said act (Cahill's St. 1931, ch. 32, ¶ 73, p. 747) in part as follows:

"Any stockholder objecting to any action of the corporation in leasing, exchanging or selling all of its corporate assets, or *objecting to a merger or consolidation* with another corporation (the corporation acquiring such assets by lease, exchange, sale, merger or consolidation being hereinafter referred to as the 'acquiring corporation'), shall be obligated to sell and transfer to the acquiring corporation and the acquiring corporation shall become and be obligated to purchase such share or shares, . . . at a price equal to the *fair value* of such share or shares with interest on such fair value at the rate of five per cent per annum from the date such sale, lease, merger or consolidation was consummated. If such fair value and interest is not paid to such objecting stockholder by such acquiring corporation within thirty days after a mailing of notice thereof to the stockholder at his last known address . . . of such sale, lease, merger or consolidation, then such objecting stockholder may, within sixty days thereafter, file a petition in the circuit court of the county in which the principal office of the acquiring corporation is located, asking for a finding and determination of the fair value of such shares of stock.

Upon the filing of such petition, the practice and procedure thereon shall be the same, so far as practicable, as that under the eminent domain laws of this State. . . . Such fair values shall be ascertained and determined *as of the date of the consummation of such sale, lease, merger or consolidation,* and without regard to any depreciation or appreciation because of or on account of such sale, lease, merger or consolidation.

"The court shall enter judgment against such acquiring corporation for the amount of such fair value, and interest thereon, which judgment may be collected as other judgments at law. Upon the payment of such judgment such stockholder shall cease to have any interest in such stock or in the property of the corporation. . . .

"Unless such objecting stockholder shall file such petition within the time herein limited, such stockholder and those claiming under him shall be conclusively presumed to have authorized, approved and ratified such sale, lease, merger or consolidation. . . . ''

In plaintiff's verified petition, filed December 21, 1931, she alleged in substance that on and before November 9, 1931, she was and now is the owner of 765 shares of the capital stock of said Grindle Co., an Illinois corporation; that on November 9, 1931, after due notice, a meeting of the stockholders of the company was held at its offices in Chicago for the purpose of considering a sale of all of its assets in exchange for stock to be issued by defendant corporation (hereinafter called the Whiting Co.), in accordance with the terms of a written proposal made by it and recommended by the directors of the Grindle Co.; that at the meeting a majority of the stockholders of the Grindle Co. voted to transfer all of its assets and good will to the Whiting Co., in consideration of certain stock is-

sued and to be issued by the Whiting Co.,—it to assume the liabilities of the Grindle Co.; that thereafter the assets and good will of the Grindle Co. were transferred to the Whiting Co., and it duly issued its stock to the stockholders of the Grindle Co., *except* to plaintiff, and the Grindle Co. thereupon became and was merged with the Whiting Co.; that at said meeting plaintiff voted against said merger and then was and still is opposed to it and to the sale and transfer of all the Grindle Co.'s assets to the Whiting Co.; that pursuant to the statute she has become obligated to sell to the Whiting Co. all of her stockholdings in the Grindle Co., and the Whiting Co. is obligated to purchase her said shares of stock "at a price equal to the fair value of such shares, with interest . . . from the date that such merger or consolidation was consummated"; that the Whiting Co., the "acquiring corporation," has not offered to plaintiff the fair value of her stock, but has offered to her a sum "much less than the fair value," which she refuses to accept; that more than 30 days have elapsed since said stockholders' meeting was held, the merger effected and notice given; and that the Whiting Co. has not paid or tendered to plaintiff the reasonable value of her stock. Therefore plaintiff, within the 60-day period mentioned in the statute, presents this petition, and prays that the court "will determine the fair and reasonable value of her said stock in the Grindle Co., as provided by the statute, and render its judgment," etc.

In defendant's answer it alleged that it has offered to plaintiff the fair value of her stock, and has at all times been ready and able to pay the same to her, and that it "neither admits nor denies the other allegations contained in the petition but calls for strict proof thereof," etc.

The attorneys of the respective parties having stipulated as to some of the evidentiary facts, plaintiff's

attorney, at the beginning of the hearing on April 11, 1932, presented and read into the record the written stipulation, in which it is first stated that the same may be offered in evidence by either party, "subject to the right of any party to object to the competency, materiality or relevancy of any of said facts,—it being understood that this stipulation is not to be regarded as presenting the *full* evidence on behalf of any party, either as to the particular matters covered by the stipulation or as to any other part of the case, and that any party may introduce other or further evidence upon any of the issues." The stipulation is in its material parts substantially as follows:

That the Grindle Co. was incorporated in 1916 under a different name, which in 1921 was changed to the present one; that in 1922 the Whiting Co. acquired a majority of the outstanding stock of the Grindle Co.,— the total of which is 14,792 shares of a total authorized number of 25,000, each having *a par value of $10;* that on November 12, 1931, the Whiting Co. owned 13,664 shares of said stock; that plaintiff was and is the owner of 765 shares; that on said day the Grindle Co. became merged with the Whiting Co., in conformity with the statute; that at the stockholders' meeting, "where such merger was had," plaintiff opposed and voted against it, and thereafter demanded that the Whiting Co. should acquire her stock at its "fair value" with interest from date of the merger, pursuant to the statute, but plaintiff's stock was not acquired by the Whiting Co. for the reason that plaintiff and defendant could not agree upon the fair value thereof; that immediately prior to November 12, 1931, the Grindle Co. owned 23 unexpired Letters Patents of the United States (numbers and names thereof are set out); that the figures at which the patents were carried on the Grindle Co.'s books "were made by taking the value placed upon certain patents by the organizers of the Grindle Co., which patents were taken

by it *in payment for stock,* except as to after acquired patents which were purchased outright''; and that ''said figures have been increased by the cost of additional patents acquired and diminished by the amortization of all patents owned by the Grindle Co.''

''That the audits for the fiscal years 1926, 1927, 1928, 1929, 1930, and 1931, made by George W. Rossetter & Co. and Haskins & Sells, or copies thereof, *or so much and such parts thereof as either party may desire,* may be offered in evidence, the same in all respects as if the books of the corporation were physically present and offered in evidence,—either party, nevertheless, *reserving the right to offer such additional evidence upon the subject matter contained in such audits,* or such parts as may be offered by either party, as they may wish.''

Thereupon plaintiff's attorney exhibited to the court several writings (the originals of which are in the present transcript). They are five reports or audits (somewhat similar as to form) of the accounts of the Grindle Co. for the years 1926 to 1930, inclusive, ending on April 30 in each year, made by Haskins & Sells, and one ''Report on General Examination of Accounts'' of the Grindle Co., for the year ending April 30, 1931, made by George W. Rossetter & Co. In the first report there are 10 pages of ''comments,'' followed by three ''Exhibits'' A. B. C.,—being respectively ''Balance Sheets, April 30, 1926, and (per books) 1925, and Comparison''; ''Balance Sheets, April 30, 1926, and (per books) November 30, 1921, and Comparison''; and ''Summary of net income for the years ended April 30, 1926, and (per books) 1925, and Comparison.'' As to said first report the following occurred:

''Mr. Trainor (plaintiff's attorney): Under the stipulation, I am offering Exhibits 'A' and 'B' of the audit for the year ending April 30, 1926.

"THE COURT: Is there any objection?

"MR. VEDDER (defendant's attorney): My only objection is that these audits are not to be offered unless there is offered with them *a statement as of November 12, 1931* (date of the consummation of the merger.) Whether Mr. Trainor expects to offer that or not I don't know. . . . Under the stipulation we have the right to object to the materiality. . . . If Mr. Trainor offers an audit as of November 12, 1931, I am not objecting to this; if he doesn't, I object to it. . . .

"THE COURT: Objection overruled. Exhibits 'A' and 'B' to said audit of 1926 may be admitted.

"MR. TRAINOR: Exhibit 'A', as of April 30, 1926, shows total assets of $256,779.50; and Exhibit 'B' shows a net worth as of said date of $107,390.31, and a net income for the year then ending of $16,935.32.

"MR. VEDDER: We object to any such showing as that. There are *explanatory statements* on there, and it is absolutely incompetent unless he offers the entire sheet that is one thing. It shows right on its face that those figures are not to be taken at their face value. . . .

"THE COURT: The objections have been overruled. (The two papers, Exhibits 'A' and 'B', attached to said first report or audit, were marked 'Plaintiff's Exhibit 1'.)"

Thereupon, over similar objections, plaintiff's attorney was allowed to introduce in evidence certain exhibits attached to said other reports of Haskins & Sells for yearly periods ending on April 30 of the years 1927, 1928, 1929 and 1930, and the same were marked, respectively, plaintiff's Exhibits 2, 3, 4 and 5. And plaintiff's attorney stated to the court certain figures which he found in said exhibits, viz.:

Exhibit 2, for the year ending April 30, 1927, total assets $270,276.49; net worth $163,733.96; income $56,333.65.

Exhibit 3, for the year ending April 30, 1928, total assets $209,084.43; net worth $146,410.80; loss for year $5467.51.

Exhibit 4, for the year ending April 30, 1929, total assets $199,956.33; net worth $135,217.99; loss for year $11,262.44.

Exhibit 5, for the year ending April 30, 1930, total assets $251,578.67; net worth $168,546.60; deficit at end of year $9045.40.

And plaintiff's attorney, over similar objections, was allowed to introduce in evidence Exhibit "A" attached to the audit of Rossetter & Co., in similar form, for the year ending April 30, 1931, which was marked "Plaintiff's Exhibit 6." This audit of Rossetter & Co. is dated August 17, 1931, and, like all the preceding audits or reports contains several pages of comments, *explanatory* of the balance sheet and other sheet or sheets attached as exhibits. Said Exhibit "A" is headed "Balance Sheet, April 30, 1931 and 1930, and Comparison." The other sheet which plaintiff's attorney did not offer in evidence, marked Exhibit "B," is headed "Summary of Income and Surplus for the years ended April 30, 1931 and 1930, and Comparison." Said Exhibit "A" showed total assets of $133,509.61; total net worth $110,365.09; deficit at end of year, $37,554.91. And plaintiff's attorney called the court's attention to certain items under the heading of "Fixed Assets—Depreciated Book Value," wherein, as regards "Patents (see comments)" the value of said patents is placed at the sum of "$18,133.31," as against the sum of the year previous of "$91,933.24" (a book depreciation as to said patents for the year of $73,779.93); and wherein, as regards "Deferred charges," no sum is listed for "organization and financing expense," none for "Development and experimental expense," and none for "Common stock bonus," while in the audit for the preceding

year ending April 30, 1930, the sums as listed for said respective items are $12,696, $7,858.66, and $6,105; or a total of $26,659.66; disclosing, with the addition of said book depreciation of $73,779.93, as plaintiff's attorney stated to the court, "an amortization *for the one year*" of over $100,000. Plaintiff did not offer in evidence any exhibits or writings purporting to show the financial condition of the Grindle Co. *on November 12, 1931* (date of the consummation of the merger).

Plaintiff also called as witnesses Aubrey J. Grindle, organizer of the Grindle Co. in 1916, who severed all connection with it in March, 1927, and John W. Clark and Daniel F. Comstock,—the two latter being engaged in the business of buying and selling stocks and other securities. Most of Grindle's testimony was not particularly pertinent to the present issue. He, however, testified that he was acquainted with the patents that the company owned in 1927, that it "would be hard to determine their value in November, 1931," but that he "would consider them worth $60,000 or $70,000." Clark testified in part in substance:

That in buying and selling securities he has had to ascertain during the past four or five years the "fair values" of stocks; that it is his present duty in the investment banking house with which he is connected "to determine the fair values of stocks that we intend to sell for investment"; that "every case is different, that there are certain fundamentals upon which we base our judgment and that the value of anything is based upon its *earnings;* that the book value and the earning power and *many other things* enter into the situation,—the business in which the company is engaged, its stability, its earnings, its future prospects, and whether the service arises from personal service or from inert assets"; that if we were to consider the purchase of a company the first thing we would look

at is the record of earnings over a period of years, and the purchase would be predicated upon that and its future prospects; that we take an average of five years for an industrial company, "based upon what we call a 'times earnings' ''; that "the number of times earnings depends upon the type of company"; that as to utility companies the usual basis was "12 or 14 times earnings," but as to industrial companies, which business fluctuates more, we would take a lower ratio to determine value, viz. "10 times earnings"; that as to industrial companies "the *rule of thumb* would be 10 times earnings on a five year average"; that "book values do not have so much bearing for the reason that no value has any value, if I may use the word again, unless it produces earnings"; that "earnings are in the final analysis the only thing upon which we can base any value"; that "book value is the property value plus the net assets,—less its funded debt and all other liabilities"; that "the book value as shown on the books, to an experienced investment banker, *needs to be explained*; that "anybody can put figures down in a book that don't mean anything unless substantiated"; that "the value of patents is anybody's guess"; that "earnings are in such a chaotic state today that it is very difficult to find out what they are"; that "I doubt if the 10 times earnings rule could properly be applied today"; that there has been a "constantly declining curve of values" since 1929; and that "I don't believe there is an equipment company making any money today, so the rule of 10 times earnings cannot be applied."

The testimony of plaintiff's other witness, Comstock, is somewhat similar. He testified in part in substance:

That the process to ascertain the "fair value" of securities "depends upon earnings and the current

condition of the company, and sometimes the book value figures to a certain extent''; that the ''main value to the holder of the stock would be the earning power of the company over a period of years''; that the ''average period taken is five years''; that ''if a company earns money and it is rather steady over a period of five years and the current position is good, we don't care much what the book value is *except* we like to have the current position to be in a *good ratio,* and if we are *buying* a stock we like to get as close as eight times the average earnings as we can, but if we are *selling* a stock we want ten times''; that by the term ''good ratio'' I mean that ''we like to have current assets about four times liabilities . . . , a four to one ratio is a good ratio''; and that ''fair value and market price are not necessarily the same; you could have a fair value and the market price might be much lower and it might be much higher; it all depends upon the distribution and the supply and demand.''

At the conclusion of plaintiff's evidence defendant moved that plaintiff's Exhibits 1 to 6, inclusive (viz., the balance sheets attached to said audits), be stricken, for the reasons that the same did not fully or properly show the net worth of the Grindle Co. at the stated times, or the ''fair value'' of the company's capital stock as of November 12, 1931, the date of the consummation of the merger. The court denied the motion.

At the beginning of defendant's case it offered in evidence, in succession, the said six complete audits or reports (particularly certain ''comments'' therein), of which only certain exhibits attached thereto (the balance sheets, etc.) had been offered by plaintiff, but said complete audits and comments, upon plaintiff's objection, were severally refused admission by the court. And it is here contended by defendant's counsel that in these rulings the court committed prejudicial error. After a careful review of the reports, and par-

ticularly the comments, we are of the opinion that there is substantial merit in the contention.

Each of the balance sheets for the years ending April 30, 1926, 1927 and 1928, bore the notation, "This statement is submitted *subject to* the accompanying comments." In the 1926 report those comments showed *inter alia* that the fixed assets and deferred charges, mentioned in the attached balance sheet, represented very little of tangible value, that the company had made no provision in its accounts for amortization of patents, for depreciation of other fixed assets, or for write-off of organization and financing expense, development and experimental expense or common stock bonus; that no amortization had *ever* been taken of the amount set up for patents; and that no depreciation had *ever* been provided for drawings or other fixed assets. And the comments in the reports for the years ending on April 30, 1927, and 1928, disclosed similar facts. Each of the balance sheets for the years ending April 30, 1929 and 1930, contained the statement that "no provision has been made on the books or in the above balance sheet for losses from uncollectible accounts, for amortization of patents, totaling $81,871.55, for depreciation of fixed assets prior to May 1, 1926, or for writing off organization and financial expense and common stock bonus." In the balance sheet for the year ending April 30, 1931 (Exhibit "A" to the report as of that date and introduced as Plaintiff's Exhibit 6) reference is made to Exhibit "B," attached to the same report, which was not introduced. in evidence by plaintiff. This exhibit "B," taken in connection with the comments in the prior reports, shows that certain reductions in the assets of the company were then properly though belatedly made, and that a proper amortization had been made, not for "one year only" as urged by plaintiff's counsel to the court as above stated, but for the purpose of showing the then true assets of the company and to rectify the mistakes

of the previous years in not making proper reductions in the assets. As the finding of the trial court as to the fair value of the shares of stock in question ($17 a share) is based almost entirely on plaintiff's Exhibits 1 to 6 inclusive, we think it clear that defendant's offered evidence was most pertinent to the issue, tended to disclose a lesser value of the stock, and should have been admitted for the court's consideration. Furthermore, the rejection of the offered evidence is against well settled principles of the law concerning evidence. In 22 Corpus Juris, sec. 163, pp. 196, 197, it is said: "So where *part* of a conversation, declaration, *document, or series of documents, book of accounts,* letter or correspondence, or transaction is shown in evidence by one party, the other party may, *for purposes of explanation,* show the remainder, or so much thereof as is necessary to a complete understanding of the part already shown, even though the result is to let in self-serving declarations." In *Boudinot v. Winter,* 190 Ill. 394, 398, it is said: "We know of no principle that will enable a party to a suit to call upon his adversary for the production of documentary evidence, and, when it is so produced, claim the benefit of such part or portion thereof as may be to his advantage, and, at the same time, reject such part as tends against him, and also deprive his opponent of the right to its use." In *Hamlin's Wizard Oil Co. v. United States Express Co.,* 265 Ill. 156, it appears that portions of certain entries in books had been offered by defendant and received in evidence to prove certain admissions by plaintiff, and that on cross-examination of defendant's witnesses the trial court had ruled over defendant's objection that plaintiff might read *other entries* in the books. In holding that the ruling was proper our Supreme Court said (p. 160): "There was no preliminary proof that the books were books of original entry and no objection was made on that account, but the entries were objected to because it appeared from the

testimony that the books were not honestly kept. The defendant, in offering entries from the books, assumed that they were competent evidence of admissions by plaintiff, and having used them to establish credits in its favor could not be permitted to deny plaintiff the benefit of what appeared therein relating to the same subject matter." (See, also, *Olson v. Brundage,* 139 Ill. App. 559, 562; *Raymond v. Howland,* 17 Wend. [N. Y.] 389, 391.)

Another contention of defendant's counsel is in substance that the trial court committed prejudicial error in refusing to admit certain oral and documentary evidence offered by defendant tending to show that the fair value of plaintiff's stock in the Grindle Co., *as of November 12, 1931* (date of the consummation of the merger), was considerably less than that claimed by her and as ultimately found by the court. Neither at that date nor at any time prior thereto was there a market value for such stock, nor had the stock been listed on any stock exchange. And on or about said date no sales of the stock had been made by any stockholder, willing yet not compelled to sell. In *McDonald v. Danahy,* 196 Ill. 133, where the plaintiff sought to recover from the estate of her deceased agent the value of certain shares of stock in an industrial corporation which he had improperly appropriated to his own use during his lifetime, and where said stock had no ascertainable market value, and where the plaintiff had recovered a judgment in her favor, our Supreme Court, in affirming said judgment, said (p. 135): "Nor did the court err, as contended by appellant, in admitting evidence as to the value of the property of the corporation above its indebtedness, as tending to fix the value of the stock. It appeared that the stock had no ascertainable market value, and it became necessary to prove its value by the next best evidence. By ascertaining the value of the assets of the company and the

amount of its liabilities and the dividends paid, the value of its capital stock could be determined with reasonable certainty.'' In *Gorham v. Massillon Iron & Steel Co.*, 284 Ill. 594, where the ''actual value'' of certain stock of the company was one of the facts to be determined, and where it was conceded that at the time of its claimed conversion the stock had no market value, the court said (p. 603) : ''In arriving at the actual value of the stock appellees were permitted to prove, and the court took into consideration, the value of appellant's (the company's) assets, the amount of its liabilities, and its earning power for a number of years prior to the conversion. As the stock admittedly had no market value, this was a proper method to pursue to determine the actual value of the stock.'' (See, also, *Johnson v. Niles Invisible Door Check Co.*, 222 Ill. App. 65, 68; *Cooper v. Nutt,* 254 Ill. App. 445, 458.) It is probable that plaintiff's attorney in the present case had in mind the above enunciated principles when he attempted to show the fair value of plaintiff's stock by the introduction of plaintiff's Exhibits 1 to 6 inclusive, which were severally attached to said six yearly audits or reports,—the last of which was for the year ending April 30, 1931 (more than six months prior to the date of the consummation of the merger). But plaintiff made no attempt to go further and introduce evidence tending to show that the company's condition was substantially the same, as to assets, liabilities and net worth, on the date of the consummation of the merger (November 12, 1931) which date under the statute is the determinative date. (See *Ahlenius v. Bunn & Humphreys,* 264 Ill. App. 177, 194.) Defendant, during the introduction of its case, sought to show a lesser value of the stock *as of said date.* But the court would not allow it to do so. It offered in evidence a balance sheet of the Grindle Co., as of said date, made by the then auditor of de-

fendant (a public accountant licensed in Illinois), but, upon objection of plaintiff, it was not admitted in evidence. The instrument is contained in the present transcript. It discloses on its face that the then total assets of the Grindle Co. were (in round figures) $131,000, the total liabilities $35,600, and the net worth $95,400; and that the par value of the then outstanding capital stock amounted in dollars to $147,920 (14,792 shares at $10 a share). This tended to show that the then value of the outstanding stock, including plaintiff's, was less than its par value of $10 a share. We think that the court erred in not admitting this instrument in evidence and considering it together with all the admitted evidence.

Defendant's counsel also contend that the court erred in refusing to allow defendant's witnesses, W. R. Bean (president of the Grindle Co.) and G. A. Critton (its patent attorney), after being qualified as expert witnesses, to express their opinions as to the value of the principal patents owned by the Grindle Co. as of November 12, 1931. When Aubrey J. Grindle (the organizer of the Grindle Co., but having no connection with it since March, 1927) was on the stand testifying as plaintiff's witness, he was asked and the court permitted him to express his opinion as to the value of the company's patents in November, 1931, and he replied that he "would consider them worth $60,000 or $70,000." While, of course, such testimony is entitled to little weight, we think that the court, *having opened the door* for the introduction of such testimony, should in fairness have heard similar expressions of opinion from defendant's witnesses. In the balance sheet of the company as of April 30, 1931, (introduced in evidence as plaintiff's Exhibit.6) under the heading "fixed assets," the value of the patents is stated to be "$18,133.31." And in the balance sheet as of November 12, 1931 (offered by defendant and

refused admission by the court) under the heading "fixed assets," the value of the patents is stated to be $16,240.39.

Defendant's counsel also contend that the court erred in refusing to admit certain other evidence offered by defendant, but we deem it unnecessary to discuss these points.

Defendant's counsel further contend that the finding or award for plaintiff in the sum of $13,011, plus interest from November 12, 1931, is not sufficiently supported by such evidence as was admitted and is excessive. As previously stated the finding is on a basis of approximately $17 a share for the 765 shares owned by plaintiff. After reviewing all of the admitted evidence we are of the opinion that there is merit in the contention. We cannot see wherein the court was justified under the evidence in finding that the fair value of plaintiff's stock was approximately $17 a share. This is $7 a share more than the par value of each of the 14,792 shares of stock outstanding. And some of the evidence offered by defendant and refused admission, taken in connection with such evidence as was admitted, tends to show that the fair value of plaintiff's stock on November 12, 1931, was less than its par value of $10 a share.

Plaintiff's counsel in his brief here filed calls our attention to the facts that the defendant corporation owned a large majority of the issued stock of the Grindle Co., that defendant controlled the Grindle Co., and that several of its officers were also officers of defendant. And counsel argues that because of these and other facts the interests of the minority stockholders of the Grindle Co. (of which plaintiff was one) had not properly been protected, resulting in loss to them, that the balance sheets did not fully and correctly show the true financial condition of the Grindle Co. at the respective dates, etc., and that, hence, the

trial court was right in its rulings excluding much of the evidence offered by defendant. We find no justification for counsel's arguments or conclusion. Counsel also suggests that because of said facts the burden of proving in this proceeding the fair value of the stock of the Grindle Co. rested as much upon defendant as upon plaintiff, and that defendant should itself have offered more proof than it did tending to show such fair value. In our opinion there is no force in the suggestions. In view of the allegations in plaintiff's petition and defendant's answer, we think that the burden rested upon plaintiff to prove by proper evidence the fair value of her stock at the date of the consummation of the merger. And the present record discloses that such efforts as were made by defendant to introduce evidence tending to show such fair value were constantly met by objections from plaintiff's counsel, which in some instances though unwarranted were sustained by the court.

Ordinarily, where a finding and judgment of a trial court are deemed by a reviewing court to be excessive, the excess may be cured by a remittitur, but after examination of all evidence in the present transcript we are unable to determine what definite figure may properly be fixed as representing the fair value of plaintiff's stock. Our conclusion is that for the errors of the court above indicated there should be another trial of the case. Accordingly, the judgment appealed from is reversed and the cause remanded.

*Reversed and remanded.*

KERNER, P. J., and SCANLAN, J., concur.