MacARTHUR et al. v. PORT OF HAVANA DOCKS CO. et al.

(District Court, D. Maine, S. D.   December 18, 1917.)

No. 776.

CORPORATIONS ⬥574—SUIT TO RESTRAIN REORGANIZATION—PRELIMINARY INJUNCTION.

The action of the majority stockholders of a corporation, not shown to be insolvent, in forming a syndicate to effect a reorganization of the company on a basis which would give them a much larger percentage of the stock of the new company than they held in the old, while the minority stockholders would have a much smaller percentage, *held* to indicate bad faith to such an extent as to entitle the minority stockholders to a preliminary injunction to restrain further action until the case could be heard on the merits.

In Equity. Suit by John R. MacArthur and another against the Port of Havana Docks Company and others. On motion for preliminary injunction. Motion granted.

Choate, Hall & Stewart, of Boston, Mass., and Woodman & Whitehouse, of Portland, Me., for complainants.

Storey, Thorndike, Palmer & Dodge, of Boston, Mass., and Verrill, Hale, Booth & Ives, of Portland, Me., for defendants.

JOHNSON, Circuit Judge. This case came on to be heard on motion for a preliminary injunction. The complainants are minority stockholders in the Port of Havana Docks Company. The defendants, other than the defendant corporation, are the holders of a majority of stock in said corporation, and all but one of them, Mr. Diaz, are directors of said corporation.

The complainants ask that the defendant corporation and the individual defendants be enjoined from selling, transferring, and assigning the entire property, corporate rights, franchises, and privileges of the defendant corporation to the Havana Docks Corporation, incorported under the laws of Delaware, or to any other corporation or parties whatever, and that the individual defendants be enjoined from voting their stock in favor of such sale.

The Port of Havana Docks Company was organized under the laws of the state of Maine in 1910. The capital stock of the corporation

consists of 40,000 shares of common stock and 6,000 shares of preferred stock, of the par value of $100 each. All of the capital stock, both preferred and common, has been issued and is outstanding.

The bill alleges that complainant John R. MacArthur is the owner of over 650 shares of the common stock and the beneficial owner of 500 shares of preferred stock, the legal title to the preferred stock being in the name of one James B. Reynolds; that Alvin W. Kreck, the other complainant, is the beneficial owner of 700 shares of the preferred stock and 1,500 shares of the common stock, the legal title to both preferred and common stock being in the name of said James B. Reynolds.

The bill further alleges that the individual defendants and parties affiliated with them own approximately 4,000 shares of the preferred stock and 24,000 shares of the common stock of said corporation; but it appears from the defense affidavits and statements of counsel that they own 1,350 shares of the preferred and 23,200 shares of the common stock.

The corporation, soon after its organization, became the owner by purchase from a Cuban corporation of a concession from the Cuban republic, under a presidential decree dated November 29, 1905, authorizing the building of four piers and warehouses along the water front of the city of Havana, and the right to collect charges for the use of the same at rates fixed therein.

In order to secure the capital for its work of construction, the defendant corporation authorized the issue of bonds to the amount of £800,000 sterling, dated February 1, 1911, and payable in 30 years, with interest at 5 per cent.

Dunn, Fischer & Co., a London banking company, purchased £675,-000 sterling of these bonds at 85 per cent. of their face value and accrued interest. With the proceeds of the sale of these bonds two piers and warehouses upon the same were built.

The corporation began its operations about March 1, 1913, at the rates which it was entitled to charge and continued them at these rates down to September 1, 1917, when, by a presidential decree issued by the president of the republic of Cuba, it was granted the right to increase these rates 60 per cent., which increased rates it has since been charging.

The defendant corporation has never paid any dividends upon any of its capital stock, either preferred or common. It has paid the interest upon bonds which it has issued from the earnings of the corporation, except the interest due in August, 1915, which was paid by money borrowed by the corporation for the term of three years, for which scrip amounting to $82,180 was issued and is still outstanding and unpaid. The bonds provide for a sinking fund of 1½ per cent. per annum beginning in 1915; but no payment or reservation for this fund has ever been made. There should have been set aside for this fund, up to and including August 1, 1917, $150,000.

The statement of operations of the corporation for the period from March 1, 1913, to November 30, 1916, shows the excess of earnings over operating expenses, including interest on bonds and depreciation

· on furniture, fixtures, and dock equipment, but not including any reservation for the sinking fund nor scrip issued to pay interest on bonds, to be $231.031.91. The net income from operations, not including the company's liabilities for sinking fund or interest on its bonds for the first seven months of the current fiscal year from February 1 to August 31, 1917, was $87,825. Upon the basis of the same tonnage for the balance of the year as was handled during the first seven months, and at the same rates, the net income from operations for the whole year would be $150,550. .

No statement was furnished at the hearing of the operating income during the months of September and October, during which time the 60 per cent. additional tariff rates were in force, nor was there any evidence of the present financial condition of the corporation, except that shown by a balance sheet of November 30, 1916.

Jose Marimon, one of the defendants, in his affidavit, states that he made the purchase in the fall of 1916 of £220,000 sterling of the bonds and 23,200 shares of the common stock for the lump sum of $1,218,000, in behalf of the syndicate.

The individual defendants have caused a corporation to be organized under the laws of the state of Delaware, called the Havana Docks Corporation, which corporation has been, or is to be, capitalized as . follows:

Authorized 6 per cent. first mortgage bonds.....................$1,500,000.00
Preferred stock, carrying 7 per cent. dividends.................. 2,500,000.00
Common stock, no par value, 50,000 shares.

A special meeting of the defendant corporation was called to be held October 24, 1917, which has been adjourned from time to time and has not yet been held. While the notice for such meeting does not state in detail the votes that are to be passed, nor the plan of reorganization contemplated, counsel for the defendants, in their brief and in argument, have stated the plan of reorganization proposed, which is as follows:

The syndicate, made up of the individual defendants, are to transfer their £220,000 sterling of bonds and 23,200 shares of the common stock of the present corporation to the new corporation, or the Delaware corporation, and receive from the new corporation 13,000 shares of its preferred stock and 36,000 shares of its common stock. The old corporation will transfer to the new all of its property, including £125,000 sterling of bonds in its treasury, subject to its debts, and the new corporation will pay therefor by issuing directly to the stockholders of the old corporation one share of its preferred stock for two shares of the preferred stock of the old corporation and one share of its common stock for two shares of the common stock of the old corporation.

The members of the syndicate who own and control a majority of the stock of the old corporation will own and control a majority of the stock of the new corporation.

Lifting the veil with which corporate action covers these transactions, the relations of the majority stockholders to them may be plainly seen. As the owners of the majority of the stock in the old cor-

poration, they will vote to sell and transfer all of its property to the new, in which they are also the majority stockholders; and as the owners of £220,000 sterling of the bonds of the old corporation and 23,200 shares of its common stock they will sell to this new corporation, controlled by them, these bonds and stock. They will, therefore, be both purchasers and sellers in these transactions, and have placed arbitrary values both upon the stock and bonds of the old corporation and upon the stock of the new corporation, in the determination of which values the minority stockholders have had no part.

The reasons advanced for this reorganization are that the defendant corporation is in failing circumstances and unable to meet its obligations; that, under the terms of the concession granted by the Cuban government, a third pier must be completed before the close of the year 1923, whose cost of construction will be at least $1,500,000; that owing to the present condition of the money market, as well as that of the corporation, it would be impossible to sell the £125,000 sterling of the bonds now in the treasury of the old corporation to obtain money with which to build this third pier; that the corporation has failed to set aside the reserve for its sinking fund to meet its issue of bonds at maturity or to provide for an amortization fund, which good business policy would require to be provided to meet the discount and expenses in the sale of bonds; that the additional tariff rates of 60 per cent. which have been granted by the president of the Cuban republic may be withdrawn at any time, and therefore cannot be relied upon as permanent future rates which may be charged by the company; that under all these circumstances some plan of reorganization is necessary to protect the capital of the corporation, which consists almost entirely of this concession, which may be lost by failure to comply with its terms.

It is not proposed, however, to dissolve the corporation and wind up its affairs because its business is unprofitable and would be conducted at a loss and it would be ruinous to the corporation and stockholders to continue it; but the plan proposed contemplates a continuance of the same business by a new corporation, which will be controlled and directed by those who now have the control and direction of the affairs of the old corporation. It is also claimed that, if any minority stockholder dissents from the plan of reorganization, his rights are fully protected by the Revised Statutes of Maine, c. 51, § 60 and following, which provide in substance that a corporation may sell and transfer all of its assets, and that a minority stockholder who dissents from the terms of the sale may, upon following the provisions of this statute, have his stock appraised and be paid the amount of said appraisal, for which he has a lien upon the assets of the corporation.

The remedy provided for a dissenting minority stockholder by the Maine statute is not exclusive, so that a court in equity is restricted thereby in affording relief by the application of equitable principles, where there has been fraud or oppressive and unfair treatment of the minority in a sale or plan of reorganization proposed by the majority stockholders of a corporation.

It would be most unjust if a minority stockholder were compelled to accept an unfair and oppressive proposition made by the majority stockholders, or, in the event of his failure to accept it, be compelled to part with his stock and forego the opportunity to share in the future earnings of the corporation.

It is not only when the proposed sale or plan of reorganization is not tainted with fraud, but also when it is not oppressive or unfair toward the minority stockholders, that it can be said that the latter have an adequate remedy under the Maine statute. If it were otherwise, instead of offering any protection to the minority stockholder against the selfish interests and cunning of the majority, the statute would prove an instrument to be used for his destruction.

The question now presented for determination is whether such oppressive and unfair treatment of the minority stockholders is threatened in this plan of reorganization that the court, considering the injury which may result to the defendants from granting a preliminary injunction and the injury which may result to the complainants from denying it, should hold property rights in statu quo until final hearing upon the bill.

The majority stockholders of a corporation occupy the position of trustees of the corporation and its stockholders, and cannot exercise the power which their majority holdings give them for their personal benefit, but must use such power for all the stockholders, the minority as well as the majority; but it is claimed that in the plan of reorganization proposed the majority stockholders are not attempting to obtain any benefit for themselves in which all the stockholders of the defendant corporation do not share, and that, if any minority stockholder is dissatisfied with or dissents from the plan, he can have the value of his stock determined by appraisal under the Maine statute.

I do not intend to enter into a discussion of the merits of the case, as now disclosed, further than may be necessary to determine whether or not there is a reasonable probability that the majority stockholders are seeking to use their power to advance their own interests at the expense of the minority stockholders in this corporation, and whether or not there is a threatened danger to the rights of the minority which, upon final hearing, may entitle them to relief.

The parties, by their affidavits in support of and in opposition to the motion for a preliminary injunction, and by testimony introduced at the hearing, have gone far into the merits of the case, and counsel have filed extensive briefs covering both the law and the facts. The plan of reorganization has been outlined by counsel in all its details, and the organization and operations of the company down to September 1, 1917, have been shown, and its financial condition upon November 30, 1916; but no information has been supplied in regard to the earnings of the company under the increased tariff rates during the months of September and October of this year, nor of the amount of cash now in its treasury and its present available assets.

I do not find, however, that the corporation is insolvent or in a failing condition, in view of the increased rates which it has been permitted to charge. The value of the concession, which constitutes the chief

asset of this corporation, lies largely in the prospect of increased earnings under the additional rates that have been granted. There seems to be no valid reason why the tonnage handled should not be as large for future years as it was in the fiscal year 1916. In that year the net earnings of the corporation from operation, exclusive of any deductions for interest on bonds or administration and general expense and the requirements of the reserve fund, were $324,958. In the statement of the auditors of the corporation, dated November 8, 1917, and annexed to the affidavit of the complainant MacArthur, the amount necessary to meet the sinking fund requirement and the interest on bonds is given as $215,000 per year. While it is true that this same statement shows that the net income from operations fell off during the first seven months of the present year, and that, on the basis of the same tonnage for the remainder of the year and at the same rates, the net earnings would be but $150,550, yet the earnings for the months of September and October under the increased rates are not given. It also appeared that there were labor troubles during last summer, so that the net earnings for May were only $1,488, and during June they fell below the operating expense to the amount of $5,257, something that had never happened before in the history of the corporation, except in March, 1913, the first month of its operations. The corporation has a practical monopoly of the docking privileges in the harbor of Havana, and it can be safely assumed that the tonnage to be handled in future years will be as great as in the year 1916. It would seem that, making all reasonable allowance for the increased cost of labor, the net income under the largely increased rates should in future years exceed that of 1916, and this future prospect is one of the large assets of the corporation.

The majority now own 22.5 per cent. of the preferred stock of the old corporation, and if the plan of reorganization is carried out they will own 54.7 per cent. of the preferred stock of the new. The minority stockholders own 77.5 per cent. of the preferred stock of the old corporation, and under the plan of reorganization they will own 9.3 per cent. of the preferred stock of the new. There will be in the treasury of the new corporation, and under the control of its majority stockholders, 36 per cent. of its preferred stock. The syndicate or majority stockholders now own 58 per cent. of the common stock of the old corporation, but if the plan of reorganization is carried out they will own 73.2 per cent. of the common stock of the new corporation. The minority own a little over 36 per cent. of the common stock of the old corporation, but under the plan of reorganization they will own a little over 14 per cent. of the new, and there would be in its treasury a little more than 12 per cent. of this common stock, under the control of the majority stockholders.

While all stockholders, under the plan of reorganization, are to be allowed to exchange their preferred and common stock in the old corporation for preferred and common stock in the new upon precisely the same terms—that is, two shares of stock, whether preferred or common, in the old, for one share of stock of the same class in the new—the great increase in the holdings of stock of the syndicate in

the new corporation will be brought about by the sale by the syndicate to the new corporation of £220,000 sterling of bonds of the old corporation at arbitrary values placed by the syndicate upon them and upon the two kinds of stock of each of the corporations, which are, for the bonds 90 per cent. of their face value, for the common and preferred stock of the old corporation $10 and $20 per share respectively, and for the common and preferred stock of the new corporation $20 and $40 per share respectively. In fixing these values the minority stockholders have had no part, and while it is true that they will be allowed to exchange their preferred and common stock in the old corporation for preferred and common stock in the new upon the basis of these values, no bonds are to be transferred by them to the new corporation.

The members of the syndicate, in the defense affidavits which have been presented, claim to have paid $1,218,000 in a lump sum for the £220,000 sterling of bonds and the 23,200 shares of the common stock of the old company held by them, and that they have incurred expenses in the way of interest and other charges in making this purchase amounting to the sum of $80,000, and $34,000 of this amount are added to this lump sum to make it equal to the combined assumed values of 13,000 shares of the preferred stock and 36,600 shares of the common stock of the new corporation.

There was no evidence in regard to the market values of these bonds or of the stock of the defendant corporation at present, but Mr. James H. Dunn, the London banker whose firm purchased £675,000 sterling of the bonds when they were issued, at 85 per cent. of their face value, and who sold to the syndicate the bonds and common stock of the old corporation now owned by them, states in his affidavit that the bonds during last summer fell as low as 50 per cent. of their face value. For their £220,000 sterling of bonds and 23,200 shares of common stock exchanged en bloc the syndicate are to receive 13,000 shares of the preferred and 36,600 shares of the common stock of the new corporation en bloc. The syndicate also owns 1,350 shares of the preferred stock of the old corporation, which they are to turn over to the new and receive therefor one-half that number, or 675 shares of its preferred stock. The minority stockholders own 4,650 shares of the preferred stock of the old corporation, which are to be exchanged for one-half that number, or 2,325 shares of preferred stock in the new. They also own 14,424 shares of the common stock of the old corporation, which are to be exchanged for one-half that number, or 7,212 shares of the common stock of the new. If the plan of reorganization is carried out the new corporation will have in its treasury £345,000 sterling of bonds of the old corporation, 9,000 shares of its preferred stock and 6,188 shares of its common stock.

The largely increased holdings of both preferred and common stock in the new corporation, which would result by this reorganization to the syndicate or majority stockholders, would arise from the exchange of their bonds and common stock of the old corporation en bloc for preferred and common stock of the new corporation en bloc.

Mr. Jose Marimon bought the bonds and stock owned by the syndi-

cate for the lump sum of $1,218,000, and it does not appear that, at the time of this purchase, any separate value was placed either upon the bonds or the stock; but under the plan of reorganization the bonds are to be exchanged at 90 per cent. of their face value and exchange at $4.86⅔, together with 23,200 shares of the common stock of the old corporation at $10 per share, for 13,000 shares of the preferred stock of the new corporation at $40 per share, and 36,600 shares of its common stock at $20 per share, the exchange to be made of bonds and stock of the old corporation lumped together for the preferred and common stock of the new lumped together. If the common stock of the old corporation held by the syndicate were to be exchanged for common stock of the new upon the same terms, or with a value of $10 per share placed upon the common stock of the old and $20 per share upon the common stock of the new, it would be in accordance with the basis of exchange provided for all the stockholders of the common stock of the old company. If this were done, the syndicate would receive for their 23,200 shares of common stock in the old corporation 16,600 shares of stock in the new, so that what they are now seeking to acquire under the plan of reorganization is 13,000 shares of the preferred stock and 25,000 shares of the common stock of the new corporation in exchange for their £220,000 sterling of bonds, upon an arbitrary value which they have fixed for their bonds and also which they place upon this preferred and common stock of the new corporation. Their bonds bear interest at the rate of 5 per cent. The preferred stock of the new company will pay a dividend of 7 per cent., and yet the syndicate or majority stockholders propose to exchange their bonds at 90 per cent. of their face value for this preferred stock at 40 per cent. of its face value.

In view of these facts I find a substantial question is presented: Whether the majority stockholders under the proposed plan of reorganization are acting in the exercise of their honest judgment as trustees of all the stockholders, or are attempting to advance their own interests at the expense of the complainants and other minority stockholders, and that pending its determination upon a final hearing of the bill, considering the little injury, if any, which may result to the defendants from granting a preliminary injunction as compared with the irreparable injury which may be occasioned to the complainants and other minority stockholders if it is denied, the present status should be preserved.

It is therefore ordered that a preliminary injunction as prayed for be issued.