This bill is to enjoin a merger of five public utility companies into the Public Service Electric and Gas Company, *Page 462 
viz., Essex and Hudson Gas Company, Hudson County Gas Company, Paterson and Passaic Gas and Electric Company, New Brunswick Light, Heat and Power Company and Somerset, Union and Middlesex Lighting Company. The Public Service Corporation owns all the capital stock of the Electric and Gas Company. The Electric and Gas Company owns more than two-thirds of the capital stock of the merging companies. Directors of the Public Service Corporation compose the board of directors of the Electric and Gas Company; members of the latter board form the directorate of four of the merging companies. A majority of the board of the fifth company is made up of a director and an officer of the Public Service Corporation and a sympathetic stockholder. The plants of the five merging companies are in the possession of the Electric and Gas Company under nine hundred year leases at net rentals that insure the stockholders of the two leasor companies first named annual dividends of eight per cent.; the next two, five per cent. and the fifth, four per cent. The avowed object of the Public Service Corporation, in merging its subordinate companies, is to get rid of the leases and to acquire the fee to the plants, and to that end caused its directors, directors in control of the subordinate companies, to resolve upon a merger agreement, and upon submission of the agreement to the stockholders caused it to be approved by the votes it controlled. Under the terms of the agreement the stockholders of the companies to be absorbed are to get, in exchange for their shares, six per cent. cumulative preferred stock (non-voting) of the Electric and Gas Company, redeemable in three years at $110. The basis of exchange is one share of preferred stock, at par, for a share of the stock of the two first-named merging companies at a value of $137; the next two at $86, and the fifth at $69. The annual yield on this basis would be slightly in advance of the dividends from the net rentals, viz., on the eight per cent. stock, $8.22; on the five per cent., $5.16, and on the four per cent., $4.14, and, it would appear, that the appraisal was influenced by a comparison of annual income rather than the market value of the stocks of the merging companies, which was then *Page 463 
selling, in a narrow market, at approximately the exchange figures. The complainants, stockholders of four of the merging companies, object to the merger as unfair and inequitable.
The attack upon them, that they are actuated in their objection by ulterior motives, finds no justification in the record; surely not as to the Fidelity-Union Trust Company, which, as trustee of the Shanley estate, represents more than ten thousand shares of the merging companies. This trustee, an appointee of this court, was ordered to intervene to protect the interest of the estate. And the subtle insinuation that the Public Service Corporation, in a measure, was moved to the merger pro bono publico is equally gratuitous. The merger has not the merit of joining two or more utilities for greater public service. It is solely for greater financial convenience of the corporation, albeit, economy in financing a public concern of this magnitude, like savings in purchasing any other commodity, is reflected in the rate making by the state.
The Public Service Corporation originally acquired local producing units upon long term leases, and, as integral parts, fashioned them into its present unified system of state-wide service of light, heat and power. In recent years this leasehold structure proved undesirable in modern financing. Fee ownership was less complicated and more inviting to investors and conducive to more conveniently financing this vast organization, involving hundreds of millions of dollars borrowed from or invested by the public. Pursuing a policy which was later employed in the instant case, many leaseholds were vacated and estates in fee acquired by merger, until nine companies were left, the five here involved and four others referred to as group "B." In 1927 the Public Service Corporation offered to the stockholders of the nine companies, for their shares, three alternative bids; cash, exchange for common stock of the Public Service Corporation or exchange for preferred stock of the Electric and Gas Company; the latter the same as offered by the merger agreement. More than two-thirds of the stockholdings in the five companies here involved was acquired through some one of these offers *Page 464 
and the merger followed. Group "B" was omitted from the merger because the Public Service had not the vote to put it over as to them. The merger agreement, procedurally, is in legal form, and the right to merge is in entire harmony with the complainants' corporate contract, but as the merger is, in reality, an appropriation of corporate property by a majority of stockholders, by force of numbers and the grace of the statute, and while no valid legal objection can be interposed on that score (Colgate v. United States Leather Co., 73 N.J. Eq. 72), the agreement calls for careful judicial scrutiny, and the burden is on the majority to show that the consideration is fair and equitable, and judgment, as to fairness, is not to be influenced by the heavy vote of approval, as it otherwise would be if the vote were independent, as indicated in Berger v. United StatesSteel Corp., 63 N.J. Eq. 809. The decision must rest on the merits, and to that end it has been shown that when the merger was in contemplation it was referred by the Public Service officials to responsible bankers to work out a scheme of conversion, and they recommended the alternative offers, and in respect of the one now the basis of the merger, supported their recommendation at the hearing and stressed the fact that the marketability of the Electric and Gas Company preferred stock gave it a marked advantage. The conversion prices, as already stated, were about the average ruling prices in the market at the time for the stocks of the merging companies. The market, it is true, was "thin." The stocks were closely held as investments and there was little activity. Sales were few and intermittent, but they were listed and the stocks dealt in by brokers, and by two of the complainant firms, which specialize in that type of securities, and sufficiently to be acceptable as a guide in determining the "full market value." Comp. Stat. p. 1661. The complainants' objection that sales were infrequent and casual, so that no market value can be said to have existed, and that resort should be had to proof of intrinsic value, might have some degree of persuasion had they come forward with that line of proof, but they contented themselves with supinely resisting the offer, simply claiming that the shares were *Page 465 
worth more. How much more, they would not say. They refused to fix a price, demurring that they did not care to part with their holdings. That unreasonable attitude was not helpful to the court in determining the fairness of the exchange, and, in that respect, that issue is held against them.
Now, in addition to fair exchange values, exchange for relative equality of securities in the merged company is implied in all mergers, and relative permanency is a vital element of the securities. The five companies were originally leased to the Public Service Corporation and it assigned the leases to the Electric and Gas Company, which in turn assumed the rental obligation. With this double undertaking the payment of dividends on the leasor companies' stock is assured beyond peradventure. This security excels in priority all the outstanding obligations of either company. The preferred stock of the Electric and Gas Company, on the other hand, is the next lowest — common stock being lower — security issued by that company, and, of this, there is now outstanding more than $71,000,000. It is subordinate to outstanding bonds and certificates of indebtedness of more than $82,000,000, and also to debts and liabilities incurred and to be incurred. As against these liabilities the corporation has abundant assets, far in excess in value. There can be little question of the soundness of the preferred stock at this time. The company has made large annual profits and the future holds promise of continued prosperity. Though the possibility of adversity is decidedly remote, such things have come to pass, as, for instance, the New York and New Haven Railroad Company and the Georgia Central Railroad and Banking Company. Then, the dividends on the preferred stock are payable only if earned, whereas the dividends on the stocks of the complainants' companies are insured in practical perpetuity, underwritten, as they are, by the entire Public Service system. The complainants' resistance and their contention that they ought not to be compelled to exchange their first lien securities for gilt-edged second line security is not without appeal, and were the decision to rest here there would be some embarrassment in squaring the merger with *Page 466 
fairness. But there is a more serious inequity — the preferred stock lacks permanency. It is redeemable within three years at the option of the Electric and Gas Company. Thus the merger, in effect, is nothing less than a forced sale by the majority stockholders to itself at a price fixed by it and payable at its pleasure. The preferred stock is but the equivalent of a six per cent. promissory note payable in three years at the option of the buyer. The merger legislation countenances no such perversion of the contractual obligations of stockholders inter sese.
Continued membership, until dissolution, is an inherent property right in corporate existence. A merger is but a fusion of corporate assets and franchises and an allocation of stock in the merged company, and works a conversion not a destruction of that right. In the ordinary case of merging going concerns and the conversion of share for share upon parity of value, all rights, including voting rights, are reserved to stockholders. The right to vote is a property right. Lord v. Equitable Life AssuranceSociety, 194 N.Y. 212. This is adverted to because the loss of it is complained of. That right, however, has lost importance, for the complainants' companies are not going concerns, and never will be, in that respect having been absorbed, and the exchange for non-voting preferred stock is harmless. That may be dismissed, but not the complainants' right of permanent participation in the merged company relatively as they enjoyed that right in the merging companies. The contingency of elimination after three years is unfair and the right to exercise the option at that time, given by the merger agreement, is oppressive and inequitable. The unlikelihood of the option being exercised, as suggested by the company, is purely speculative and the burden of anxiety is not to be put upon the complainants. If money should become cheap and the Public Service could float a new issue at an appreciably profitable lower percentage of interest, redemption would undoubtedly follow, consistently with its past policy of good business.
The redemption feature at $110 offers no adequate compensation, for the complainants would be obliged to reinvest *Page 467 
their capital at a correspondingly low rate of return, and besides suffer loss of interest pending reinvestment. It is true, the complainants would encounter the same disadvantages if their stocks were appraised under the compensation provision of the statute, but that is presently subordinate, for before the Electric and Gas Company may resort or the complainants be driven to that extreme measure, the fairness of the merger must be vindicated (Colgate v. United States Leather Co., supra), and it would then be available to the Electric and Gas Company only if non-voting stockholders dissented therefrom or refused or neglected to convert their stocks. The purpose of the statutory grant of eminent domain in this limited form is to perfect, not accomplish a merger. It is not overlooked that under the Merger act the merger agreement may provide for "converting the capital stock of each of said merging or consolidating corporations into the stock or obligations of such new or consolidated corporation," thus implying that obligations may be given in exchange. Here, obligations are not offered and the question does not directly arise. On the contrary, the exchange for preferred stock may later become an obligation of the complainants to take. The offer amounts to that. However, fairness in mergers dictates that when obligations are given in exchange for stocks of the character here involved, they at least should bear a corresponding permanent investment value, such, for instance, as the perpetual interest bearing certificates of the Electric and Gas Company, or like obligations, otherwise a merger would be a simple medium for a compulsory sale; and that is not permissible.
The Public Service corporations contest the right of a court of equity to interfere in the internal affairs of the merging companies in the absence of fraud, actual or constructive. There is, of course, no suggestion that the majority stockholders entered into the merger agreement with actual intent to defraud the minority. Neither have they earned a decoration for unselfishness. The objection of the defendant corporations is, as an abstract proposition, accepted doctrine, and the principle was recognized in Bingham v. Savings Investment *Page 468 and Trust Co., 101 N.J. Eq. 413, where dissatisfied stockholders sought to prevent their company from absorbing two others. That case involved purely internal management of a going concern, honestly pursued. Here the situation is different. The complainants' companies are about to be absorbed and the minority stockholders face the possibility, if not the probability, of being cast into the discard. This, by right of might and by means unwarranted and oppressive, and their only appeal for relief is to this court. The merger will be enjoined.
The complainants' contention that the merger is ultra vires
because the contracting companies were not organized to carry on business of the same or similar nature is not sound. The agreements by which many former public utility companies were merged into the Public Service Electric and Gas Company are silent as to corporate purposes of the consolidated company so that resort must be had to the charters of the merging companies. The totality of these disclose the object to be "to furnish light, heat and power for domestic and public use in New Jersey." Sometimes this definition is couched in other language descriptive of the same purpose, viz., "the manufacture, use and sale of gas for illuminating, heating and other purposes," or "for the carrying on the business of an electric company," or "to manufacture and sell gas for the purpose of lighting streets, buildings, c." After the bill raised the question of dissimilarity, the charters of the merging companies here involved were amended in respect of corporate purpose so that now each is identical with the one quoted. Thereafter a duplicate merger agreement was acted upon. A protest followed, that the powers mentioned in the amended charters, by means of which the common purpose is to be effected, are in some charters by the use of gas, in others by gas and electricity, and therefore the purpose is dissimilar. This is hypercritical. The avowed purpose is to furnish light, heat and power, and whether it be produced by gas or by gas and electricity does not militate against the common corporate object; they have the same or similar purposes of service. A gas company may consolidate with an *Page 469 
electric company. 7 Thomp. Corp. § 8220; Municipal Gas Companyof Albany v. Rice, 138 N.Y. 151.
The complainants also set up that the Essex and Hudson Gas Company had not the power to amend its charter to furnish "light, heat and power for domestic and public use in New Jersey" because of a provision in its charter that "the company, however, shall have no right to extend its business operations beyond the limits of the territory above described [Essex and Union counties and certain territory of Hudson county] without the unanimous consent of the stockholders of the said company," and, therefore, is not eligible to join in the merger. This restriction to a field of operation is not a barrier to a merger with another company operating in a different territory. The right of merger extends to companies whose business is of the same or similar nature. The location of the contracting companies is irrelevant. A gas company in Sussex may merge with one in Cape May.
The remaining objection to consolidation is that the Hudson County Gas Company is not qualified to join in the merger because it is a consolidation of five gas companies, four of which were organized under special acts, the fifth under the Gas act of 1876, and had not the power under the twenty-seventh section of the Corporation act to amend its charter as to objects of its incorporation so as to harmonize with those of the other companies engaged in the merger. The point is that the twenty-seventh section permits such changes only "by corporations organized under this act." The Hudson County Gas Company, by consolidation, came into existence as a new company in 1899 under the Corporation act of 1896. It was in fact and in law organized under that act and literally comes within the definition of the section granting the power to amend. See Bingham v. InvestmentSecurity and Trust Co., supra; 140 Atl. Rep. 321. *Page 470