[No. 31776. *En Banc.* April 10, 1952.]

ARCHIBALD R. MATTESON, *Appellant*, v. ROBERT ZIEBARTH
*et al., Respondents.*[1]

[1]Reported in 242 P. (2d) 1025.

*Jones, Birdseye & Grey,* for appellant.

*Little, LeSourd, Palmer & Scott,* for respondents.

HAMLEY, J.—This is an action by a minority stockholder of Ziebarth Corporation to set aside a merger agreement between that corporation and Snowy, Incorporated. He alleges that the agreement is illegal, unfair, and fraudulent. Named as defendant, in addition to the two corpora-

tions, is Robert Ziebarth, the majority stockholder of both corporations. Defendants joined in an answer denying plaintiff's characterization of the merger agreement. They also allege, affirmatively, that plaintiff is bound by the agreement because he failed to pursue the statutory remedy available to dissatisfied stockholders.

The plaintiff is Archibald R. Matteson. In 1946, he and Ziebarth organized Ziebarth Corporation for the purpose of producing and selling a powdered household bleach. The corporation was capitalized at fifty thousand dollars, represented by fifty thousand shares of common stock having a par value of one dollar a share. The organizers subscribed for 11,200 shares. In payment therefor, they transferred to the corporation certain property, including a formula, trademarks, machinery, equipment, and supplies, valued at $11,200.

It was agreed that Matteson owned a one-third interest in this property and Ziebarth owned the remaining two-thirds interest. Accordingly, Matteson received thirty-six hundred shares of stock, and Ziebarth received seventy-six hundred shares. Ziebarth's attorney, F. A. LeSourd, subscribed and paid for one share to qualify as a director and officer. Ziebarth later acquired additional stock of the company by purchase, so that in May, 1950, he owned 27,200 shares.

Matteson worked full time for the company until January, 1948. His salary was one hundred fifty dollars a month at first, but was later increased to two hundred twenty-five dollars a month. Ziebarth devoted over one half of his time to the affairs of the corporation, from the time of its organization until April, 1950. His compensation for such services during this entire period was less than five hundred dollars. While he was reimbursed for some of his expenses incurred in promoting the sale of the product, he apparently absorbed a substantial amount of such expense.

Ziebarth Corporation lost money almost consistently. By May 31, 1950, it had lost $15,235.34 of the twenty thousand dollars capital which Ziebarth had supplied. As early as

1947, it was realized that the corporation could not operate profitably without expanding the market for "Snowy," as the powdered bleach was called. The alternatives seemed to be to obtain additional capital or sell out. However, no immediate solution was found in either of these directions. In an effort to minimize losses, the corporation adopted a retrenchment program at the end of 1947. It was then that Matteson went off the payroll. Thereafter, he apparently took little interest in the corporation. Ziebarth continued to devote a great deal of his time to the company, but received no compensation after January 1, 1948.

In April, 1949, Ziebarth entered into negotiations with Harold Schafer, president of Gold Seal Corporation, looking towards the sale of Ziebarth Corporation. Gold Seal is a North Dakota corporation engaged in the sale of household chemical products throughout the United States and Canada. After numerous conferences and considerable travel back and forth, a proposed agreement between the two corporations was arrived at by Ziebarth and Schafer, assisted by their attorneys.

Under this proposal, Ziebarth corporation would, in consideration of the payment of one hundred dollars, grant to Gold Seal the right to use the formulas and the trademark "Snowy" until December 31, 1951; Gold Seal would agree to employ Ziebarth, and Ziebarth would agree to accept such employment, for a period of eight months at a salary of two thousand dollars a month for two thirds of Ziebarth's time, it being provided that Ziebarth would, if requested, remain in the employ of Gold Seal for an additional sixteen months; Gold Seal would be granted the option to purchase all of the shares of Ziebarth Corporation for one hundred thousand dollars, or twenty-five per cent of the net profit of Gold Seal derived from the sale of "Snowy" bleach up to December 31, 1951, whichever sum was greater; the stockholders of Ziebarth Corporation would deposit their stock in escrow to be held under the terms of the agreement; and in the event Gold Seal did not exercise its

option, that corporation would agree not to sell any type of powdered bleach for a period of three years, and would permit Ziebarth Corporation to use the same package used by Gold Seal in merchandising "Snowy" bleach.

This proposal was considered at a meeting of the stockholders of Ziebarth Corporation, held on May 1, 1950. At that time, the corporation had 33,851 shares of stock outstanding, distributed as follows: Ziebarth, 27,200 shares; Matteson, 3,600 shares; Robert Denker, 2,675 shares; Lester Swank, 175 shares; Fred B. Hurd, 100 shares; H. W. Ziebarth, 100 shares; and F. A. LeSourd, one share. All of this stock was voted in favor of the proposed agreement with Gold Seal, except that held by Matteson, who cast the lone dissenting vote. He took the position that the sixteen thousand dollars Ziebarth was to receive as an employee of Gold Seal was, in the main, part of the consideration paid by Gold Seal for the agreement, and hence all stockholders should share in that sixteen-thousand-dollar payment.

Ziebarth and his attorney thereafter tried to get Matteson to change his mind. Matteson finally said he would do so if Ziebarth would give him twenty-five per cent of the sixteen thousand dollars Ziebarth was to receive as salary from Gold Seal. Ziebarth refused to do this. Because Gold Seal's proposal was limited to the purchase of all of the stock, as distinguished from the assets, of Ziebarth Corporation, one hundred per cent participation by the stockholders of Ziebarth Corporation was essential. Therefore, Matteson's refusal to vote for the proposed agreement blocked its consummation.

Convinced that the Gold Seal proposal was the only salvation for Ziebarth Corporation, Ziebarth then sought to consummate the transaction by means of a merger between Ziebarth Corporation and a new corporation organized for the specific purpose. It is this merger which Matteson resists in this action.

The new corporation, named Snowy, Incorporated, was organized on May 17, 1950. It had an authorized capitalization of one hundred thousand shares of common stock

having a par value of thirty cents a share, and one hundred thousand shares of preferred stock having a par value of twenty cents a share. Ziebarth subscribed and paid for 30,150 shares of this common stock, H. W. Ziebarth subscribed and paid for one hundred shares, and F. A. LeSourd subscribed and paid for one share.

On May 18, 1950, the directors of Ziebarth Corporation and Snowy, Incorporated, approved a merger agreement between the two corporations. In the merger, stockholders of Ziebarth Corporation were to receive one share of twenty-cent par value callable preferred stock of Snowy, Incorporated, for each share of Ziebarth Corporation common stock theretofore owned by them. On the same day, Ziebarth signed an instrument advising Hurd, Denker, and Swank (the three principal minority stockholders of Ziebarth Corporation other than Matteson) that he was giving them an option to purchase common stock of Snowy, Incorporated. The instrument provided that they could purchase from Ziebarth, at the par value of thirty cents each, the same number of shares of Snowy, Incorporated, as they then held in Ziebarth Corporation.

On May 31, 1950, the merger agreement was approved by the holders of two thirds of the voting power of all shareholders of Ziebarth Corporation, as required by statute (Rem. Rev. Stat. (Sup.), § 3803-43 [P.P.C. § 443-17]). Matteson was, in fact, the only stockholder to vote against the merger at this meeting. Subsequently, on June 5, 1950, an option agreement, similar to the original proposal, was entered into between Snowy, Incorporated, and Gold Seal. Thereupon, Ziebarth undertook his duties as an employee of Gold Seal and received, in due course, the stipulated sixteen-thousand-dollar consideration for such services.

Matteson instituted this suit on June 12, 1950. The case was tried to the court without a jury, and resulted in a decree dismissing the action with prejudice. Plaintiff has appealed.

The first assignment of error pertains to the court's receiving in evidence a letter (exhibit 12) and the corporate

minutes of a particular meeting of the board of directors of Ziebarth Corporation (exhibit 13). Appellant asserts that these writings are self-serving and therefore inadmissible, citing *Stusser v. Gottstein,* 178 Wash. 360, 35 P. (2d) 5.

Exhibit 12 is a copy of a letter, dated May 15, 1950, written by Ziebarth to Matteson, in which the desirability of consummating the sale to Gold Seal is reviewed and Matteson is urged to reconsider his refusal to accept the proposal. This exhibit was not offered or received as proof of any facts therein stated. It was offered to establish that there had been a full disclosure to Matteson of the circumstances surrounding the Gold Seal proposal. The letter was therefore relevant, material, and admissible on the issue of fraud. It tended to establish the *bona fides* of the transaction by negating nondisclosure and secrecy. *Stusser v. Gottstein, supra,* is not in point. There, a letter written by one of the parties three years after the issue arose was offered as proof of facts therein stated. Exhibit 12 was properly admitted.

Exhibit 13 is a copy of the minutes of the special meeting of the board of directors of Ziebarth Corporation, held on May 18, 1950, at which meeting the merger agreement was approved. Those minutes contain a summary of statements made at the meeting by Ziebarth in support of the merger proposal. However, the minutes also record the corporate action there taken, including the adoption of a resolution approving the merger, and the vote of individual directors on this resolution. This exhibit was not offered or received as proof of any of the facts recited in the statements of Ziebarth summarized therein. It was offered as proof, by the official records of the corporation kept in the ordinary course of business, of the action taken at the meeting. It was admissible for this purpose and was properly received.

The next assignment of error relates to the action of the trial court in requiring appellant to testify, over his own objection, as to a conversation he had with Ziebarth. In this conversation, Matteson indicated a willingness to vote for the Gold Seal proposal, if Ziebarth would give him twenty-five per cent of the sixteen thousand dollars Ziebarth was

to receive as salary from Gold Seal. It is appellant's position that this testimony was inadmissible, as it related to an offer of compromise. *Moore v. Stetson Machine Works,* 110 Wash. 649, 188 Pac. 769, and *Svea Fire & Life Ins. Co. v. Spokane P. & S. R. Co.,* 175 Wash. 622, 28 P. (2d) 266, are cited in support of appellant's view.

The cited cases announce the well-recognized rule that offers of compromise are not admissible in evidence as admissions of liability of the party making them. In each of these cases, there was an attempt to establish liability by proof of offers to compromise made after the transaction in issue. In the case before us, however, the testimony concerning the twenty-five per cent demand was not elicited to establish an admission of liability on Matteson's part. It was introduced as one of the actual transactions between the parties while the Gold Seal proposal was under consideration. It has a bearing upon appellant's real objection to the proposal and his good faith in opposing it. The testimony was therefore relevant to the issues before the court and unobjectionable on the ground contended for.

The next eight assignments of error challenge certain findings of fact and conclusions of law and the entry of judgment thereon. The points of law and fact raised by these assignments present two principal questions. These are: Should the merger be set aside on the ground that it is illegal because not of a kind contemplated by law? Should the merger be set aside on the ground of unfairness or fraud?

Relative to the first of these questions, appellant contends that the merger is of a kind not contemplated by law because one of the corporations was organized immediately prior to the merger for the sole purpose of the merger. This has reference to the incorporation of Snowy, Incorporated, for the express purpose of merging with and absorbing Ziebarth Corporation.

The kind of corporations which may merge or consolidate in this state are specified in Rem. Rev. Stat. (Sup.), § 3803-42 [P.P.C. § 443-15]. It is there provided, in part, that any two or more domestic corporations, formed for any purpose for which a corporation might be formed "under

this act," may be merged into one of such domestic corporations. A corporation may be formed, under the act, "for any lawful business purpose" with certain exceptions not here in point. Rem. Rev. Stat. (Sup.), § 3803-2 [P.P.C. § 441-1].

Snowy, Incorporated, was organized by the majority stockholder of Ziebarth Corporation, for the express purpose of consummating an option agreement involving the possible sale of all the outstanding stock of the latter corporation. The option agreement could not otherwise be effectuated due to the opposition of Matteson, a minority stockholder of Ziebarth Corporation. There is nothing in the uniform business corporation act to indicate that this is not a "lawful business purpose." Nor does appellant cite any authority to that effect. We therefore conclude that Snowy, Incorporated, was a kind of corporation which might, under the statute, merge with Ziebarth Corporation.

Appellant also contends that the merger is not of a kind contemplated by law, because common stockholders of the absorbed corporation were required to accept, in lieu of that common stock, redeemable preferred stock in the surviving corporation. It is asserted that the transaction amounted to nothing more than a forced sale of Matteson's equity in Ziebarth Corporation, and that this is not permissible under the merger statute. *Outwater v. Public Service Corp.*, 103 N. J. Eq. 461, 143 Atl. 729, is cited in support of this view.

The merger statute authorizes the directors of the two corporations to draft the details of the merger. Rem. Rev. Stat. (Sup.), § 3803-43. There are no restrictions concerning the nature of the stock to be issued. The directors may agree to allocate to the stockholders of the absorbed corporation whatever stock interest in the surviving corporation appears proper under the circumstances. The statute does not proscribe an allocation of callable preferred stock in the surviving corporation, even though it may result in the ultimate ouster of the recipient of such stock from any interest in the business.

Whether that feature of the merger plan, though conforming to statutory requirements, introduces an element of

unfairness or fraud sufficient to move a court of equity, is an entirely different question. That question will be considered below. The decision in *Outwater v. Public Service Corp.,* relied upon by appellant, involved this latter question and turned upon a finding of unfairness. The court there expressly held that no valid legal objection could be interposed on the ground that the stock to be allocated was redeemable. In our opinion, the allocation feature complained of in the instant case is permissible under the merger statute.

This disposes of the first question presented by the group of assignments of error now under consideration. As indicated above, the other general question posed by these assignments is whether the merger should' be set aside on the ground of unfairness or fraud.

Before coming to the merits of this question, we must deal with respondents' contention that the uniform business corporation act precludes the granting of equitable relief except where actual fraud is shown.

■ Rem. Supp. 1949, § 3803-41, provides that a shareholder who did not vote in favor of specified kinds of corporate action (including mergers), and who, within twenty days after notice of the meeting called to vote upon such corporate action was mailed to him, filed his written objection demanding payment for his shares, shall have the right to have his shares appraised and paid for. This section also defines, as follows, the legal rights of shareholders who have not followed this procedure:

" . . . Any shareholder who did not vote in favor of such corporate action and who did not within the time allowed him file with the corporation his written objection to such corporate action, demanding payment for his shares shall be bound by such corporate action *with like force and effect as though such shareholder had voted in favor of such corporate action.*" (Italics ours.)

Appellant voted against the merger and failed to file written objections and demand payment for his shares. He is therefore subject to whatever restrictions upon his available remedies are imposed by the above statute.

Respondents appear to concede that this statute does not preclude a resort to equity where the gist of the action is actual fraud. As to anything short of actual fraud, however, they contend that the statute referred to provides the exclusive remedy. Appellant, on the other hand, argues that the remedy is not exclusive where there is any generally recognized basis for equitable relief, such as unfairness or overreaching, even though it does not amount to actual fraud.

The cases cited by appellant in support of his proposition are not in point. They involve either a situation where there was no appraisal statute in effect (*Jones v. Missouri-Edison Electric Co.,* 144 Fed. 765); or where the statute contains no provision making the corporate action binding (*Colgate v. United States Leather Co.,* 73 N. J. Eq. 72, 67 Atl. 657; *Outwater v. Public Service Corp., supra; Cole v. Nat. Cash Credit Ass'n,* 18 Del. 47, 156 Atl. 183; *MacArthur v. Port of Havana Docks Co.,* 247 Fed. 984; *May v. Midwest Refining Co.,* 121 F. (2d) 431); or where the statute making the corporate action binding was not in effect when the decision was rendered (*Olympia Box & Package Co. v. Pacific Veneer Co.,* 123 Wash. 533, 213 Pac. 24; *Moore v. Los Lugos Gold Mines,* 172 Wash. 570, 21 P. (2d) 253; *General Inv. Co. v. Lake Shore & M. S. Ry. Co.,* 250 Fed. 160).

In the states which have statutes generally similar to the quoted provision of our own act, the courts have uniformly held that the minority shareholder may not obtain relief in equity where his claim is based upon unfairness rather than fraud. *Adams v. United States Distributing Corp.,* 184 Va. 134, 34 S. E. (2d) 244, 162 A. L. R. 1227; *Wick v. Youngstown Sheet & Tube Co.,* 46 Ohio App. 253, 188 N. E. 514; *Pridmore v. Whiting Corp.,* 268 Ill. App. 592; *Homer v. Crown Cork & Seal Co.,* 155 Md. 66, 141 Atl. 425; *Wall v. Anaconda Copper Mining Co.,* 216 Fed. 242.

We are of the view that, under our own act, the statutory remedy is likewise exclusive as to unfairness or breach of fiduciary duty short of actual fraud. This is subject to the qualification, however, that the statutory remedy

is not exclusive unless the facts concerning such unfairness or breach of fiduciary duty were known to the aggrieved stockholder at the time of the stockholders' meeting at which the corporate action was approved.

This qualification is necessary in view of the "with like force and effect" provision of the above statute, shown in italics. Where a stockholder consents to the corporate action, he is bound, under principles of estoppel, as to any claim of unfairness concerning which he had knowledge at that time. *Roy & Co. v. Scott, Hartley & Co.,* 11 Wash. 399, 39 Pac. 679; *Baker v. Seattle-Tacoma Power Co.,* 61 Wash. 578, 112 Pac. 647. Such a stockholder is likewise bound as to any claim based upon breach of fiduciary duty short of actual fraud, concerning which breach he had knowledge at that time. *Tefft v. Schaefer,* 136 Wash. 302, 239 Pac. 837, 1119; *Von Herberg v. Von Herberg,* 6 Wn. (2d) 100, 106 P. (2d) 737; 3 Fletcher Cyclopedia Corporations (Perm. ed.) 460, 463, §§ 979, 980. Hence, in either of these cases, he is bound, under the statute, "with like force and effect." But since in the above cases the consenting stockholder would not have been bound if he did not have knowledge of the facts (for then there could be no estoppel), neither is he, if then unaware of the facts, bound under the statute.

We now come to a consideration of the various reasons advanced by appellant why the merger agreement should be set aside on the ground of unfairness or fraud. In connection with each, we will have to make the preliminary determination of whether, under the particular circumstances, the claim is now foreclosed to appellant under our construction of the act.

The first of these reasons is based upon the assertion that the merger agreement was intended and used as a device to give the majority stockholder of Ziebarth Corporation, for his own use, a substantial portion of the consideration for the Gold Seal option ($16,000), which should have gone to all stockholders on a *pro rata* basis. This refers to the provision of the option agreement under which Gold Seal agreed to employ Ziebarth, and he agreed to accept such

employment, for a period of eight months at a salary of two thousand dollars a month.

▮ At the time of the stockholders' meeting of Ziebarth Corporation, at which the merger was approved, Matteson knew all of the essential facts in connection with the six-teen-thousand-dollar transaction. Therefore, he may not now predicate his claim for relief upon an assertion of unfairness or breach of fiduciary duty in connection with that matter, since such a claim is foreclosed under the act.

This leaves for examination the question of whether there was a showing of actual fraud in connection with this six-teen-thousand-dollar transaction. The trial court made the following findings of fact regarding the character of this transaction and the real reason for Matteson's opposition thereto:

"V. . . . that the proposition of the Gold Seal Company was expressly made contingent upon the defendant Robert Ziebarth's becoming an employee of the Gold Seal Company, as general manager of its proposed bleach division, for a minimum of eight months (with an option to require his services for an additional period) at a salary of $2,000.00 per month plus expenses. . . .

"X. That the real reason for the plaintiff's objection to the Gold Seal proposal and to the merger which was designed to make possible its consummation was not any inadequacy of the amount he was to receive insofar as his stockholdings were concerned; that his opposition was due to the belief that he could require, as a condition to the giving of his consent, the payment to himself of 25% of the $16,000.00 salary which was paid to the defendant Robert Ziebarth by the Gold Seal Company, under its agreement with said Robert Ziebarth, for services actually rendered to the Gold Seal Company by said Robert Ziebarth which were of the reasonable value of $16,000.00; that the plaintiff, in objecting to the Gold Seal proposal and seeking to exact said payment of 25% of the defendant Robert Ziebarth's salary, was acting solely for his own benefit and not for the benefit of other stockholders of the Ziebarth Corporation; that the plaintiff had had no connection with the business of the Ziebarth Corporation, other than as a stockholder, after January 1, 1948, and had had no part in the negotiation of the Gold Seal proposal, and was therefore not entitled

to share in any way in the salary received by the defendant Robert Ziebarth from the Gold Seal Company.

"XI. That the proposal of the Gold Seal Company which was submitted to the special meeting of stockholders of the Ziebarth Corporation on May 1, 1950, was advantageous not only to the defendant Robert Ziebarth but also to all of the other stockholders of the corporation; and that in view of the corporation's financial status and the failure of previous attempts to sell the business, this proposal represented the only real chance for the stockholders of Ziebarth Corporation to get anything out of their stock ownership."

Appellant challenges each of these findings. We have examined the testimony and exhibits and are of the view that the evidence does not preponderate against the findings in question. No useful purpose would be served by setting out and discussing that evidence in this opinion. In view of these facts, as set forth in the trial court's findings, it cannot be said that the merger agreement was intended and used as a device to give the majority stockholder a personal side consideration which should have gone to Ziebarth Corporation or all of its stockholders. We are therefore convinced that fraud has not been shown with regard to this circumstance, and that it therefore provides no basis for equitable relief.

The second reason advanced by appellant why the merger agreement should be set aside on the ground of unfairness or fraud has to do with the kind of stock which he was required to receive under the merger agreement. The requirement, in brief, was that he and other shareholders of Ziebarth Corporation give up their common stock in that corporation for redeemable preferred stock in Snowy, Incorporated. The effect of this exchange was to place it within the power of Snowy, Incorporated, to oust appellant from all interest in the bleach business by calling and redeeming his preferred stock. We have already considered this circumstance in connection with another question.

A stock-exchange arrangement of this kind may be unfair to a minority stockholder. See *Outwater v. Public Service Corp., supra.* But, as we have seen, Matteson is

bound by the corporate action as against any claim of unfairness concerning which he had knowledge at the time of the stockholders' meeting where the merger was approved. He did, of course, have knowledge of this stock-exchange plan at that time. Hence, it provides no basis for equitable relief on the ground of unfairness. The same conclusion must be reached if this circumstance is relied upon as establishing a breach of fiduciary duty short of actual fraud.

There is no basis whatever for holding that this stock-exchange plan evidences actual fraud. The redeemable feature was applicable to all stockholders of Ziebarth Corporation, and was necessary in order to consummate the option arrangement with Gold Seal. There was good reason to believe that this option contract was the only salvation for the hard-pressed Ziebarth Corporation.

It is these facts which distinguish this case from *Theis v. Spokane Falls Gas Light Co.*, 34 Wash. 23, 74 Pac. 1004, relied upon by appellant. In that case, it was held that an attempted dissolution of a prosperous corporation and the transfer of its assets to a new corporation, not for any *bona fide* business reason, but for the sole purpose of getting rid of a disagreeable stockholder who refused to sell his stock, was fraudulent and would be set aside. The limited scope of the rule laid down in the *Theis* case has been previously noted in *Smith v. Flathead River Coal Co.*, 66 Wash. 408, 119 Pac. 858; and *Beutelspacher v. Spokane Savings Bank*, 164 Wash. 227, 2 P. (2d) 729.

We conclude that actual fraud has not been shown in connection with the stock transfer plan. The claim in connection with this matter accordingly affords no basis for equitable relief.

The third reason presented by appellant why the merger agreement should be set aside on the ground of unfairness or fraud relates to the value placed on the common stock of Ziebarth Corporation for purposes of the exchange of stock with Snowy, Incorporated. The Ziebarth Corporation stock was valued at twenty cents a share for this purpose. Appellant argues that this valuation is grossly inadequate.

For the reasons heretofore stated in connection with other claims of unfairness and fraud, already discussed, we are of the view that the claim now before us presents a basis for equitable relief only if it is indicative of actual fraud.

There is no finding of fact dealing specifically with the adequacy of the twenty-cent valuation assigned to the shares of Ziebarth Corporation. However, there is this finding relative to the financial condition and business prospects of that company:

"IV. That during the entire lifetime of the Ziebarth Corporation, from July, 1946, to May, 1950, its business was not profitable, the corporation losing a total of $15,235.34 during that time; that it was apparent in early 1950 that unless additional capital could be found or unless a sale of the business could be effected, this corporation was on the brink of bankruptcy."

Appellant challenges this finding of fact, but we believe that it is supported by the preponderance of the evidence. Also pertinent to this inquiry is finding of fact No. XI, quoted above, in which it is indicated that Ziebarth Corporation was in such a precarious position that the Gold Seal option represented the only real chance for the stockholders to recoup their investments. The testimony dealing with the precise question of stock valuation is in direct conflict. In view of the trial court's finding as to the general financial condition of the company, we are inclined to place greater credence in the testimony tending to support the twenty-cent valuation as being fair and adequate. At any rate, in view of the heavy burden placed upon one who seeks to show fraud, we cannot say that the exchange price was so grossly inadequate as to indicate fraud.

The final reason presented by appellant why the merger agreement should be set aside on the ground of unfairness or fraud relates to the option which Ziebarth gave to stockholders of Ziebarth Corporation, other than appellant, to purchase an equal number of shares of the common stock of Snowy, Incorporated, at thirty cents a share.

Appellant contends that this was grossly discriminatory against him. He also contends that it tainted the transac-

tion with fraud because it represented a side benefit given to all stockholders except appellant, for the purpose of allaying their opposition and obtaining their favorable vote. In the alternative, appellant argues that, if the merger agreement is determined to be valid, then the common stock option feature should be regarded as a part of that agreement, and Ziebarth should be required to extend the same option to appellant. This view is advanced in appellant's eleventh and final assignment of error.

It should be noted that this last and alternative suggestion came from appellant as an afterthought, after the close of the trial. Neither in his complaint nor at any time during the trial did appellant suggest that he be given such relief. When asked, on cross-examination, whether he would accept common stock in Snowy, Inc., in settlement of the controversy, appellant was unprepared to answer, and asked that a written offer be submitted for his consideration. It was not until the trial court, at the close of the trial, had orally ruled against appellant's request that the merger be set aside, that appellant brought forward, in a proposed finding of fact, this new theory.

If, as alleged in appellant's complaint, Ziebarth offered the option to the other minority stockholders for the purpose of inducing them to vote for the merger agreement, then such agreement is tainted with fraud and should be set aside. The facts conclusively establish, however, that this was not the purpose or effect of the option arrangement. Ziebarth did not need the votes of Hurd and Denker as directors of Ziebarth Corporation to obtain approval of the merger. Respondent Robert Ziebarth, his attorney, F. A. LeSourd, and a relative, H. W. Ziebarth, were also directors of that corporation, and could provide the required majority vote of directors. See Rem. Rev. Stat. (Sup.), § 3803-43. Nor was the option needed to influence the votes of Hurd, Denker, and Swank as stockholders of the corporation. Ziebarth held more than two thirds of the voting power of all shareholders of Ziebarth Corporation, and so did not need the vote of any other stockholder.

Accordingly, it cannot be said that the option arrangement was fraudulent. Under our analysis of Rem. Supp. 1949, § 3803-41, we cannot inquire as to whether this option arrangement evidences a breach of fiduciary duty, or injects an element of unfairness, requiring equitable relief, unless the facts regarding the option were unknown to appellant at the time of the stockholders meeting of May 31, 1951. Appellant testified that he had not seen the written option until the trial, but that he had heard rumors regarding it. He did not testify as to when these rumors first came to his attention. The fact is, however, that only twelve days after the stockholders' meeting, appellant subscribed and swore to his complaint herein, in which all the essential details regarding the option are alleged. It is therefore altogether likely that appellant, at the time of such meeting, had sufficient knowledge of the option arrangement to make the statutory remedies operative as to that cause of complaint.

If it be assumed, however, that appellant was not then apprised of the option plan, and that inquiry may therefore be made as to breach of fiduciary duty and unfairness, we are nevertheless of the opinion that no basis for equitable relief has been shown. The option was not intended as a part of the merger plan. Both Ziebarth and his attorney so testified, and there is no testimony to the contrary. The option was not extended by the new corporation, but by Ziebarth, individually. While he was the majority stockholder of that corporation, that factor did not disqualify him from selling or giving away some of that stock to whomever he chose, as long as fraud or breach of fiduciary duty were not involved.

We have already indicated that no fraud was involved. There was no breach of fiduciary duty, unless Ziebarth's act in extending this option was adverse to the best interests of Ziebarth Corporation or its stockholders. It was not adverse to Ziebarth Corporation, because it was not a part of the merger agreement. It was obviously not adverse to the minority stockholders other than appellant. Nor was it ad-

verse to appellant, since it deprived him of nothing to which he was otherwise entitled.

Ziebarth had a legitimate reason for excluding appellant from his personal and voluntary offer to give minority stockholders some additional stock in the new corporation. Appellant had been uncooperative in solving the financial problems of Ziebarth Corporation, thereby occasioning substantial expense and delay to the corporation. He had unjustifiably accused Ziebarth of arranging a side consideration for himself that should have gone to the corporation. Appellant had also made the wholly improper proposal to Ziebarth that, for a side consideration of four thousand dollars, appellant would withdraw his opposition to the original Gold Seal option plan.

 The foregoing considerations lead us to conclude that no breach of fiduciary relationship or basic unfairness inheres in Ziebarth's option to other minority stockholders, requiring that the merger be set aside. For the same reasons, we are of the view that appellant is not entitled to a decree requiring Ziebarth to extend the same option to appellant.

The judgment is affirmed.

SCHWELLENBACH, C. J., MALLERY, HILL, DONWORTH, FINLEY, WEAVER, and OLSON, JJ., concur.

GRADY, J. (dissenting)—I am not in accord with the views expressed in the majority opinion to the effect that RCW 23.40.010 (Rem. Rev. Stat. (Sup.), § 3803-42 [P.P.C. § 443-15]) contemplates a merger of two corporations, one of them merely colorable and not created to perform any business function, but the whole arrangement being to enable the going concern to give an option for the purchase of all of its corporate stock and property, which could not otherwise be accomplished without the consent of all of its stockholders.

The statute relating to merger and consolidation of domestic corporations is as follows:

"Any two or more domestic corporations formed for any purpose for which a corporation might be formed under the

provisions of this title or any such domestic corporations and any foreign corporations authorized by the laws of the government under which they were formed to effect such a merger or consolidation and which have authority to carry on any business for the conduct of which a corporation might be organized under this title, may be:

"(1) Merged into one of such domestic corporations; or

"(2) Consolidated into a new corporation to be formed under the provisions of this title."

The whole theory of merger of two corporations is that they may combine their activities and thus render better service to their patrons and enhance the interests of their respective stockholders. When a merger is spoken of, one has in mind corporations having some business purpose as we ordinarily understand that term, and such is contemplated by the statute authorizing the formation of corporations. One does not think of a business corporation merging with one organized by a group of its stockholders not to transact any business, but to attain a nonbusiness objective. Corporations may be organized to carry on a lawful business. I do not think the legislature used the word "business" to include the purposes for which Snowy, Incorporated, was incorporated.

Stripped of all artificial dressing, we have this situation: Ziebarth Corporation was engaged in the business of manufacturing and selling a powdered bleach. The business was not a financial success. Ziebarth had invested considerable money in the enterprise. He owned and controlled a majority of the corporate stock. He desired to give an option to purchase all of the common stock of the corporation to Gold Seal and enter into its employ upon a substantial salary. Matteson, a minority stockholder, objected to the giving of the option for the consideration the stockholders other than Ziebarth would receive. This blocked Ziebarth's plan. He then caused Snowy to be incorporated, not to engage in any "lawful business" as contemplated by statute, but merely to have a paper corporation with which Ziebarth Corporation might merge, and thus, by the machinery provided by statute, force Matteson to sell his stock or lose his

investment. It does not seem to me the statute authorizing a merger of corporations contemplates such a transaction as the one Ziebarth is trying to carry out. If we say the Ziebarth Corporation and Snowy, Incorporated, can be merged in order to carry out the contemplated sale to Gold Seal, we open the way to a new method of freezing out minority stockholders merely because they disagree with the majority on questions of corporate policy. To use such words as fraud, conspiracy, or bad faith is somewhat harsh and serves no useful purpose, but this whole deal has a bad odor and I cannot subscribe to its approval.

May 29, 1952. Petition for rehearing denied.

[1]Reported in 242 P. (2d) 1048.